Filed 7/28/22  P. v. Wilson CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LEMUEL WILSON,<br><br>    Defendant and Appellant. | A157485<br><br>(Contra County Super. Ct.<br>No. 5-180922-7) |

Appellant, Lemuel Wilson, speeding on a highway off-ramp, lost control of his vehicle and slammed into another car driven by a mother taking her three sons home from a drive-in movie.  After Wilson's car came to rest, he got out, refused help from several bystanders, and escaped on foot as the mother screamed over her children, two of whom died at the scene.  The youngest child, an infant, survived serious head wounds and other injuries.

Wilson was arrested after going to the hospital for his own injuries the following day, when a test of his blood-alcohol concentration (BAC) showed no alcohol in his system.  A jury convicted Wilson of two counts of second degree, implied malice murder (Pen. Code, § 187, subd. (a)), driving under the influence of alcohol (DUI) causing great bodily injury to multiple victims within 10 years of a prior DUI conviction (Veh. Code, §§ 23153, subd. (a),

1

23558, 23560; Pen. Code, § 12022.7, subds. (a) & (b)), and leaving the scene of an accident (Veh. Code, § 20001, subd. (a)).

Wilson raises claims of *Batson/Wheeler* error (*Batson v. Kentucky* (1986) 476 U.S. 79, 97; *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277), and erroneous admission of evidence of advisements previously given Wilson under Vehicle Code section 23593, which reflected the holding in *People v. Watson* (1981) 30 Cal.3d 290 (*Watson* admonitions), both because the evidence created a conclusive presumption that drunk driving is dangerous and because it was hearsay; failure to instruct on lesser included vehicular manslaughter offenses on counts 1 and 2 and simple battery on count 3, instructional omissions claimed to be required sua sponte to clarify the meaning of the great bodily injury enhancements; insufficiency of the evidence of all four great bodily injury enhancements; and sentencing error under Penal Code section 654.

We reject all his claims except one: the jury had no substantial evidence to support its findings that the two boys who died at the scene had been rendered comatose before they died. (Pen. Code, § 12022.7, subd. (b).) Accordingly, we shall strike those two great bodily injury enhancements. This does not reduce the aggregate sentence of 24 years to life.

## I. BACKGROUND

It is undisputed that Wilson's Infiniti SUV, while traveling at least 83 miles per hour on June 30, 2017, at approximately 10:58 p.m., collided with Aida Reyes's SUV, killing two of her children, severely injuring the third, and also injuring her. Wilson was exiting Highway 4 at Solano Avenue in Concord, while Reyes was lawfully entering Highway 4 at a normal speed and was stopped at a metering light. Wilson failed to negotiate a curve on the highway off-ramp; his car jumped the divider and hit Reyes's Dodge

2

Durango from the rear. The back of Reyes's vehicle was "thrashed." It "had been ripped open like a can of tuna" or "a sardine can."

Reyes's two older sons, Lorenzo,[1] age 10, and Vincent, age five, were ejected from the vehicle, both suffered massive head wounds, and they succumbed quickly after the collision at the scene. The baby, Luciano, three months old, was gravely injured but survived, after spending 49 days in the hospital. Reyes herself suffered neck injuries and spent two days in the hospital.

The key factual issue at trial was whether Wilson was driving under the influence of alcohol. On that issue, the prosecution presented evidence that Wilson had made a purchase for $7.27 at Town and Country Liquor in Oakland sometime that day. The amount of the charge could have covered three or four mini-bottles of pink Barefoot wine, which was Wilson's "go-to" alcoholic drink, and one or two other items. An empty four-pack carton of Barefoot wine was also found in Wilson's car, but no empty wine bottles were found. Wilson had taken two selfies that day at 10:10 p.m. showing him holding an open Barefoot mini-bottle of pink wine while seated in the driver's seat of his SUV.

Weighing against that evidence was the preliminary hearing testimony of Wilson's brother, Cortez Wilson, who had spent the day with Wilson on the date of the collision, and who testified at the preliminary hearing that Wilson had consumed no alcohol while they were together until 9:30 or 10:00 p.m. The preliminary hearing transcript was read to the jury. In addition, the first people to reach Wilson after the collision smelled no alcohol on Wilson.

---

[1] Members of the Reyes family, other than Aida Reyes, will be referred to by their first names only. No disrespect is intended.

3

After the collision, Wilson's car was catapulted 267 feet and came to rest atop a fire hydrant in the parking lot in front of Kinder's Barbecue restaurant. The first people on the scene were two employees of Kinder's. One, Torin Papp, called 911 and tried to help Wilson while he was still trapped in his car by a deployed airbag. The other, Nicholas Okodogbe, helped Wilson up after he fell from the car seconds later. Neither of them smelled alcohol on Wilson's breath, though Okodogbe came within 6 to 12 inches of Wilson's mouth and Papp within "a couple feet," and there was no odor of alcohol or marijuana in Wilson's SUV.

Wilson had blood running down his forehead and appeared dazed. Okodogbe initially thought it was a one-car accident and did not realize Reyes's car was involved until he heard her screaming and crying out, "Who killed my babies?" Two other women who had been sitting outside a gym nearby heard a loud noise and drove up to the on-ramp, where they encountered Reyes and her wrecked vehicle and called 911.

Okodogbe told Wilson he should sit down and rest, but Wilson mumbled, "I got to get out of here." Wilson dropped his cell phone, and Okodogbe retrieved it and later turned it over to the police. Other Kinder's employees tried to come to Wilson's aid, but he refused their assistance. After one minute and 20 seconds, Wilson took off walking, but when a restaurant employee attempted to catch up to him, Wilson ran off and evaded capture.

The first to respond to the several 911 calls were CHP officers and officers of the Concord Police Department, who arrived within two minutes and pronounced Lorenzo dead without offering aid. They briefly but unsuccessfully tried to revive Vincent. Reyes and Luciano were taken to the hospital.

4

Autopsy testimony established that Lorenzo died of severe blunt force trauma to the head. Death was caused by "two fatal head injuries"— dislocation of the base skull cervical vertebra and tearing of the brain stem. Both injuries are "almost always . . . lethal" and would have led to "very rapid death." Tearing of the brain stem leads to "almost instantaneous death."

Vincent likewise suffered blunt force trauma to the head. Vincent's head injuries caused "lots of tears in his brain" which caused him to "immediately lose consciousness." "Very rapidly" his heart stopped, and he "stopped breathing." The forensic pathologist was never asked to give a time of death for either boy, and no time estimate was given to amplify his words, "very rapid death."

Little Luciano survived his lengthy stay in the hospital. He had a shunt put into his brain to prevent seizures, and he required physical and occupational therapy. At the time of trial, his right hand was still weaker than his left. Reyes herself sustained neck injuries, which caused severe pain and kept her in a neck brace for two months. Her back and neck still hurt at the time of trial.

After attending to the victims, the police searched for Wilson in the area of the collision, including by helicopter, but gave up after two or three hours. By 2:00 a.m., Wilson was a named suspect based on paperwork found in his abandoned vehicle. A CHP crash notification card was left in the door of Wilson's residence in Antioch. Wilson was next spotted at approximately 4:00 a.m. in the parking lot of a condominium development near the drive-in theater where Reyes had taken her sons to the movie. Wilson was attempting to flag down help, but the woman who saw him passed him by in her car.

At 8:09 a.m., CHP issued a Facebook and Twitter press release identifying Wilson as a suspect in an automobile crash the night before that killed two children. Wilson's sister, Monique Wilson (Monique), soon learned of it and began phoning family members, including their cousin, Zalinda Wilson (Zalinda).

Sometime that morning, Wilson called his friend, Savee Pralourng, who had helped him buy his SUV and was a cosigner on the sales contract, and he asked her to report the vehicle stolen. She started to comply until Monique called her and told her not to. Monique told Pralourng about the accident and said Wilson was going to turn himself in.

At roughly 9:30 a.m. on July 1, 2017, Wilson's wife drove him from Antioch to his cousin Zalinda's house in Oakland, arriving around 10:00 a.m. Supportive relatives and friends soon began arriving. At 11:20 a.m., they all left as a group for the hospital. Zalinda called ahead to 911 and told them Wilson would turn himself in at Highland Hospital in Oakland. She sought a "peaceful surrender" on his behalf. At 11:38 a.m., Wilson showed up at Highland Hospital, seeking treatment for his injuries, accompanied by a caravan of about five cars containing 10 to 15 relatives and friends.

Wilson's blood was drawn at 12:08 p.m., and the results showed no ethanol, or drinking alcohol, present. Nevertheless, by presenting expert testimony about the elimination rate of alcohol, together with the alcohol content of mini-bottles of Barefoot wine, the prosecution established that Wilson could have had a BAC level of .09 percent or higher at the time of the crash (three mini-bottles at .03 percent each). The expert testified that everyone is alcohol-impaired and unable to safely operate a motor vehicle at .08 percent, and most people (75 percent) are so impaired at .05 percent.

6

Among the evidence presented by the prosecution was testimony and documentary evidence that Wilson had been given a so-called *Watson* admonition on five prior occasions.[2] (See *Watson*, *supra*, 30 Cal.3d at pp. 293, 298.) That statutorily required advisement, given three times when Wilson had previously been convicted of a DUI offense and twice when he applied to the DMV for an identification (ID) card, told him "driving under the influence of alcohol is extremely dangerous to human life." (Veh. Code, § 23593.) He was further advised that if he drove while intoxicated and someone was killed as a result, he could be "charged with murder." When he applied for one of the ID cards, he signed a statement acknowledging he had read and "agree[d] with" the *Watson* admonition. A DMV expert testified about Wilson's DMV records and driving history, including that he had suffered three prior convictions for speeding in addition to his history of three prior misdemeanor DUI convictions in 2005, 2006 and 2010.

Evidence of Wilson's uncharged DUI violations and other driving history evidence was admitted under Evidence Code section 1101, subdivision (b) solely on the issues of "knowledge and motive." The evidence of Wilson's driving history came in both documentary form (exhibits 32–42) and in the form of testimony by a DMV expert. The court ruled it was

---

[2] The prosecutor moved in limine for permission to introduce a packet of documentary evidence of Wilson's DMV driving history, including interpretive expert evidence by a DMV employee, which included evidence of Wilson's three prior DUI convictions and three speeding convictions, in addition to the *Watson* admonitions. The *Watson* admonition appeared in small print on the ID application. The prosecutor's in limine motion was granted with the exception of certain details, but there was no separate objection to admission of the *Watson* admonitions, independent of the other evidence of Wilson's driving history. The court admitted evidence of the *Watson* admonitions Wilson had received. The documentary evidence (exhibits 32–41) was admitted without objection.

relevant to the issue of *knowledge* as it relates to implied malice on the murder counts, and the *Watson* admonitions specifically were relevant to *motive* on the fleeing count. The judge found the evidence far more probative than prejudicial.

The jury was given a limiting instruction, which it is presumed to have followed. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 409.) The judge instructed the jury that the evidence of Wilson's prior DUI convictions was admitted "for the limited purpose of deciding whether or not the defendant knew that driving under the influence of alcohol was dangerous to human life and whether the defendant deliberately acted with conscious disregard for human life." He told them the prior conviction evidence was to be used "for the limited purpose of determining the defendant's knowledge and motive." The jury was required to find the prior convictions true by a preponderance of the evidence before it used them for any purpose. The limiting instruction, however, was not expressly tied to the *Watson* admonitions; it related to Wilson's DMV record of uncharged offenses in general. Defense counsel did not request a special instruction telling the jury how it could use evidence of the *Watson* admonitions.

The jury found Wilson guilty of all charges and found all enhancements true. The court sentenced Wilson to an aggregate term of 24 years to life, comprised of an indeterminate term of 15 years to life each on the two murder counts, imposed concurrently, and a nine-year determinate term, composed of a two-year middle term sentence on count 3 (DUI with injury with prior DUI within 10 years), three years each on the two great bodily injury enhancements under Penal Code section 12022.7, subdivision (a), imposed consecutively, five years on each of two enhancements under subdivision (b) of the same section (stayed under Pen. Code, § 654), and one

8

year (one-third the middle term) imposed consecutively on count 4 (leaving the scene of an accident). (Veh. Code, § 20001, subds. (a) & (b)(2).)

## II. DISCUSSION

### A. *The* Batson/Wheeler *Issue*

#### 1. The Law

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759.) " ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' " (*Id.* at pp. 759–760.) "The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' " (*Id.* at p. 760.)

A *Batson/Wheeler* motion proceeds on a three-step analysis. First, the burden is on the movant to make a prima facie showing of " 'discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*).) A prima facie case consists of evidence, the totality of which allows the trial judge to draw an inference of discriminatory purpose. (*Ibid.*) The prima facie showing requirement sets a " 'low threshold.' " (*People v. Battle* (2021) 11 Cal.5th 749, 773 (*Battle*), quoting *People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*).) Second, once a defendant "makes a prima facie showing, the burden shifts to the [prosecutor] to come forward with a neutral explanation for challenging" the prospective juror in question. (*Batson, supra,* 476 U.S. at p. 97.) Unless " 'discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " (*Purkett v. Elem* (1995) 514 U.S. 765, 768.) Third, if the proffered justification is

9

race-neutral, then the court must consider whether the defendant has proved it was more likely than not the peremptory challenge was based on "purposeful discrimination." (*Batson*, at p. 98.) On the third step, the court focuses on the subjective genuineness of the prosecutor's explanations, not their objective reasonableness. (*People v. Silas* (2021) 68 Cal.App.5th 1057, 1104.)

### 2. The Prosecutor's Peremptory Challenges and the Defense *Batson/Wheeler* Motion

Defense counsel made a *Batson/Wheeler* motion when the prosecutor exercised his seventh peremptory challenge. This was the second of the prosecutor's peremptory challenges that he had used to take an African-American woman off the jury. The prosecutor used his fourth peremptory challenge on Ms. H., Juror No. 16. Ms. H. had answered "no" to all the questions on the juror questionnaire designed to elicit answers showing the juror's possible biases, and the judge had no further questions for her when she entered the box. In response to the prosecutor's voir dire, she said she could be fair and base her verdict on the evidence alone, and she expressed no difficulty with the concept of implied malice. She did not believe the burden of proof is too high in criminal cases, but as we shall discuss, she did express some reluctance to rely on circumstantial evidence.

The prosecutor used his seventh peremptory challenge on Ms. K., Juror No. 38. Ms. K., too, answered "no" to all the questions on the questionnaire that sought to elicit biases. She said she could be fair and would "go with the facts," but she admitted "struggling" with the single-witness rule.

In his oral motion outside the jury's presence, defense counsel merely identified the prospective jurors in question, noted they were African-American women who had indicated they could be fair, and noted both were peremptorily challenged by the prosecutor. Wilson points out on appeal that

African-Americans in general and African-American women comprise separate protected classes. (*People v. Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at p. 759; *People v. Cornwell* (2005) 37 Cal.4th 50, 70 & fn. 4; *People v. Motton* (1985) 39 Cal.3d 596, 600, 605–606, 608), a point that was not made in the trial court. At times Wilson seems to premise his appellate arguments on the idea that the *Batson/Wheeler* motion was based on discriminatory strikes against African-American women. That is not clear from the transcript, however.[3] We construe Wilson's trial motion as being based on challenges to African-Americans generally, and any claim that it was limited to African-American women has been forfeited by failure to spell it out at trial. (See *Cornwell*, at pp. 70–71, fn. 4.)

After defense counsel made his motion, the judge asked the prosecutor if he had any response on the adequacy of the prima facie showing. The prosecutor responded: "Yes, I don't believe there is one. Thank you, Your Honor. There is, I believe, one African-American juror remaining on the panel, and both of those jurors clearly expressed some concerns when I questioned them about various issues, particularly single witness rule for Ms. [H.] and circumstantial evidence for (Juror No. 28) [*sic*]. And so I—for those obvious reasons, kicked or challenged those jurors. I don't believe a prima facie showing has been made."

---

[3] The record shows there were four African-Americans altogether on the panel: one male who was excused for cause over defense objection; the two women who were peremptorily challenged by the district attorney; and a fourth individual still in the box when the *Batson/Wheeler* motion was made. Whether that fourth African-American was male or female cannot be ascertained from the record. Neither counsel nor the court identified the juror's sex, name or juror number. To the extent Wilson claims the prosecutor excused *all* African-American women from the jury, that inference is not warranted.

The court then invited defense counsel's further remarks, and he responded: "On the prima facie issue, we had three—we've had four—we've had a [dearth] of African Americans in the whole panel. We've had four in the box. So far one was challenged for cause over my objection, there's one remaining, and then there were two other women who both said they could be fair. One of them—actually, they were both fairly extensively questioned and they were challenged, so. We've had three in the box so far, two of them have been challenged."

### 3. The Trial Court's Ruling

The trial judge indicated both attorneys' recitations were "factually . . . correct." It should be noted, however, that the prosecutor reversed the prospective jurors' names and their answers when he referred to their voir dire. In fact, it was Ms. H. who was reluctant to rely on circumstantial evidence and Ms. K. (Juror No. 38, not 28) who was skeptical about the single witness rule. The judge failed to take notice of the discrepancies in the prosecutor's statement.

The judge then ruled that no prima facie showing had been made, explaining: "Just so the record is complete, the record should reflect that [Wilson] is African American. Both counsel are Caucasian, for what it's worth. I don't know that that's relevant. [¶] Secondly, at this stage, as I mentioned, I'm applying the standard of Johnson versus California and the cases since then that—to determine whether there's a prima facie showing, that is, whether the defendant has shown based on a totality of the relevant facts, that there's an inference of discriminatory purpose or whether the circumstantial evidence is sufficient to permit the court to draw an inference that discrimination has occurred. [¶] Obviously, African Americans are a protected class or a class that can qualify, and African American women, of course, would also be within a class that is to be subject to consideration

12

under Batson-Wheeler. [¶] I do not find a prima facie case had been shown based on the evidence as a whole, but I will permit [the prosecutor] to put any supplemental comments on the record that you wish to articulate in the event that a reviewing court disagrees with my prima facie showing—or finding." The prosecutor then elaborated upon his reasons for excusing the two jurors in question. The judge declared a recess and made no further comments or rulings.

### 4. The Standard of Review

In these circumstances, we review the trial court's step-one finding of no prima facie showing. (*Scott*, *supra*, 61 Cal.4th at pp. 385–391.) Wilson urges us to apply a de novo standard of review, but the deferential substantial evidence standard is the correct standard. The trial judge's reason for denying the motion at step one was conclusory, as Wilson points out, but the judge did apply the correct standard for making that determination and so stated on the record, namely that of *Johnson*, *supra*, 545 U.S. 162, discussed above. In these circumstances, reviewing a trial court's step-one finding, we apply a deferential standard of review to the denial of a defendant's *Batson/Wheeler* motion, considering only whether the ruling is supported by substantial evidence. (*Battle*, *supra*, 11 Cal.5th at p. 772; *People v. Bonilla* (2007) 41 Cal.4th 313, 341–343.)

The de novo standard applies only if the trial occurred before the United States Supreme Court's decision in *Johnson* and the trial court applied the wrong standard of proof on the prima facie burden, or if it is not possible to determine which standard of proof the trial court applied. (*People v. Rhoades* (2019) 8 Cal.5th 393, 428–429.) This, however, is not such a case. Wilson's trial did not predate *Johnson*. Accordingly, de novo review is not appropriate. The ordinary substantial evidence standard of review applies.

(*Battle*, *supra*, 11 Cal.5th at p. 772; *People v. Silas*, *supra*, 68 Cal.App.5th at p. 1095.)

### 5. The Trial Court's Finding of No Prima Facie Showing Was Supported by Substantial Evidence

Wilson's argument for why the trial judge should have found a prima facie case rests almost entirely upon statistics, and not very meaningful statistics because of the small numbers involved. He emphasizes that the removal of two African-American jurors, plus a third excused for cause over defense objection, eliminated from the jury 75 percent of the African-Americans available to try the case. (See *Batson*, *supra*, 476 U.S. at pp. 96–97 [in assessing a prima facie case, a relevant question may be whether there is " a 'pattern' of strikes against" an identifiable group of jurors]; *People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3, overruled on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13 (*Sanchez*) [although the ultimate issue on a *Batson/Wheeler* motion is " 'not whether there is a pattern of systematic exclusion,' . . . a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges"; "to make a prima facie case after the excusal of only one or two members of a group is very difficult"].) Even disregarding the challenge for cause, Wilson points out, 67 percent of all remaining African Americans in the box were removed by the prosecutor. He points out, of course, that Wilson is also African-American, and he claims the two peremptorily excused jurors were questioned more extensively than any other prospective jurors. We find the latter point unsupported by the record.

In his reply brief, Wilson suggests the prosecutor struck *all* the African-American women on the jury panel. The record does not support that conclusion, however. (See fn. 3, *ante*.) For this reason, Wilson's reliance on *People v. Allen* (2004) 115 Cal.App.4th 542 and *People v. Arellano* (2016)

14

245 Cal.App.4th 1139 is misplaced.  In both of those cases, *all* the members of a cognizable group had been removed by the prosecutor.  (*Arellano*, at pp. 1156, 1159; *Allen*, at p. 550.)  Wilson attempts to claim this is such a case, but no showing of the same kind has been made here.

When a trial court denies a *Batson/Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire at the time the motion was made.  (*Scott*, *supra*, 61 Cal.4th at p. 384.)  Even though facilitation of appellate review is the main justification by trial courts for allowing prosecutors to put their reasons on the record after finding no prima facie case (see, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1105, fn. 3; *People v. Turner* (1994) 8 Cal.4th 137, 166–167, overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn.5), we are forbidden to consider the prosecutor's postruling reasons for his strikes as support for the trial court's prima facie ruling.  (*Scott*, at p. 390.)

A trial judge considering a *Batson/Wheeler* motion at step one may base his or her ruling on the entirety of the voir dire and may " 'consider nondiscriminatory reasons for a peremptory challenge that are apparent from and "clearly established" in the record [citations] and that necessarily dispel any inference of bias.' " (*People v. Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at p. 760.)  Thus, the standard allows for some latitude in drawing inferences about why the prosecutor objectively *might reasonably have exercised* his or her peremptory strikes.  Yet, "the fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage." (*Scott*, *supra*, 61 Cal.4th at p. 390.)  Hence, we do not consider whether the record of voir dire supports the prosecutor's postruling statement as to his actual reasons for excusing jurors Ms. H. and

15

Ms. K., but rather review the record of voir dire objectively to identify any concerns a reasonable prosecutor might have had that would have led to the peremptory strike against each prospective juror on nondiscriminatory grounds.

It is clearly established in the record that Ms. H. struggled with the concept of circumstantial evidence. Specifically, the prosecutor used a hypothetical based on a family dressed in Oakland A's fan gear riding on BART toward the Coliseum station on game day. In the hypothetical, Ms. H., postulated to be a fellow BART passenger, was presented with increasing circumstantial evidence that the family was headed to the game, but Ms. H. felt she could not conclude they were going to the game. Even when she was told she saw one of them drop a ticket to the game, she would "presume" they were going to the game, but she remained "skeptical" and could not be "100 percent" sure until she saw them "hand that ticket over" at the entry to the ballpark.

Likewise, Ms. K. expressed difficulty with the single-witness rule. The prosecutor used a hypothetical to question prospective jurors in which a woman named Sharon told her coworkers that she had just seen an acquaintance named Phil riding away on a new red mountain bike, and a coworker claimed it was his bike. Upon further investigation, Sharon and her coworker discovered his bike chain cut and left behind, with his bike missing. The hypothetical included the fact that the prospective juror believed Sharon, but the question was whether he or she would require more proof. Ms. K. responded by questioning or rejecting aspects of the hypothetical instead of focusing on whether Sharon's credible testimony was enough to conclude Phil stole the bike. When the prosecutor asked if she was "struggling" with the hypothetical or with the single-witness rule, she

16

responded, "Probably the single witness." Indeed, the prosecutor challenged Ms. K. for cause on this ground. Although the trial judge denied the challenge for cause, the judge said he understood the prosecutor's concern and the basis for the challenge.

Thus, the record shows that a prosecutor could reasonably have questioned whether either Ms. H. or Ms. K. would be able to follow the court's instructions on these or other legal concepts. In addition, one African-American remained in the box at the time of the motion, though we cannot tell whether he or she ultimately served on the jury. The reasons we have hypothesized for a reasonable prosecutor's strikes are facially neutral and do not raise an inference of bias. That is true in spite of the prosecutor's step-one response to the motion, which reflected an imperfect memory of voir dire. But the question remains whether the hypothesized race-neutral reasons for excusing these jurors also "necessarily dispel any inference of bias." (*People v. Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at p. 760; *Battle*, *supra*, 11 Cal.5th at p. 773.)

In his reply brief, Wilson puts forth an argument that the prosecutor's strikes were racially motivated by critiquing in detail the hypotheticals used by the prosecutor in voir dire and suggesting pretext in the prosecutor's conclusion that the two prospective jurors had difficulty with or resistance to certain legal concepts. We are reluctant to credit arguments that would find a discriminatory purpose in a prosecutor's imperfectly conceived hypothetical. Moreover, Wilson's theory is supported by reference to the prosecutor's closing argument, when the prosecutor told the jury his theory of Monique's "complicity" and Zalinda's "lies" and false claims of "lack of knowledge." In reviewing the *Batson/Wheeler* prima facie finding, however, we must focus

on the facts known to the trial judge when he ruled on the motion. (*Scott, supra*, 61 Cal.4th at p. 384.)

We do find some support in the record outside of voir dire for Wilson's theory that the prosecutor may have schemed to rid the jury of African-American women because he feared they would sympathize with Monique and Zalinda—two African-American women whom the prosecutor later accused of conspiring with Wilson to keep him away from authorities until after the alcohol in his system had burned off—and such jurors might be disinclined to convict Wilson. Wilson claims the prosecutor "viciously attack[ed] an African-American family," including Wilson's sister and female cousin, and "their family values" in his closing argument. While that may be an overstatement, it is true the prosecutor examined the two women vigorously on their prior inconsistent and evasive preliminary hearing testimony, and in argument he accused them of conspiring with Wilson to delay his arrest and of engaging in a "coverup."

The prosecutor said nothing about their "family values," but we agree with Wilson that the prosecutor could conceivably have had a hidden motive for the challenged strikes. Even if we indulge Wilson's theory for purposes of argument, though, Wilson has not shown that any such discriminatory motive would have been known to or suspected by the trial judge when he made his *Batson / Wheeler* ruling.[4]

---

[4] The peremptory challenges in this case were exercised on April 11, 2019, and the *Batson* motion was heard at that time. On April 8, 2019, the prosecutor had filed motions in limine which included a motion to impeach Zalinda and Monique with evidence of prior DUI convictions if they denied "general knowledge of the concept of alcohol burnoff in the DUI context." The in limine motion was heard on April 15, 2019. The judge ultimately ruled the prior DUI convictions were admissible for the jury's assessment of the witnesses' credibility only, and the jury was so instructed.

18

Although the district attorney's motions in limine had been filed before the *Batson/Wheeler* ruling, the record does not establish that the judge had yet read the motions or knew of their content when he ruled on the *Batson/Wheeler* motion. (See fn. 4, *ante*.) Defense counsel did not point out the prosecutor's intention to impeach Monique and Zalinda with their prior DUI convictions, much less his suspected intention to accuse them of helping Wilson delay his surrender. If Wilson's trial counsel shared his appellate counsel's suspicions about the prosecutor's motives, then he should have raised those suspicions in his *Batson/Wheeler* motion as part of his prima facie showing. He could have used the prosecutor's in limine motion to impeach Monique and Zalinda with their prior DUI convictions as evidence to support his motion. (See fn. 4, *ante*.)

The prosecutor's theory, as later explained to the trial judge, was that the two women "conspired with [Wilson] to delay his turn-in at the hospital to prevent the acquisition of a blood sample" that would show he had been drinking the night before. This came out at the hearing of the in limine motions on April 15, 2019, but that was four days *after* the judge ruled on the *Batson/Wheeler* motion. (See fn. 4, *ante*.)

The timing convinces us that Wilson's current theory of discriminatory strikes must be rejected. Wilson cannot use the prosecutor's closing argument to cast doubt on whether his peremptory challenges were discrimination-free. Wilson's theory is speculative, constructed from the record on appeal after the fact. Though it may sound plausible in hindsight, this theory cannot form the basis for reversal because (1) the *Batson/Wheeler* motion was not limited to African-American women, and (2) the theory of discriminatory strikes put forth on appeal was not presented to the trial judge.

Even if the prosecutor had hidden motives for excusing African-American women, if those motives were not suspected by the trial judge at the time of the *Batson/Wheeler* ruling, and if they were not pointed out as part of the *Batson/Wheeler* motion, then no inference of discriminatory purpose arises from the removal of two female African-Americans from this male African-American's jury. Thus, there was no "inference of bias" for the plausible explanations of the prosecutor's strikes to "dispel." The rebuttable presumption favoring the legitimacy of the prosecutor's peremptory challenges was never rebutted. Considered under the proper deferential standard of review, the judge's step-one *Batson/Wheeler* ruling is supported by substantial evidence and does not require reversal or remand.[5]

---

[5] Even assuming Wilson made a sufficient prima facie showing at step one of the *Batson/Wheeler* proof framework, as we read the record the trial court implicitly accepted the prosecutor's stated reasons for exercising the peremptory challenges at issue here as nondiscriminatory and neutral. That finding is supported by the record no matter what standard of review applies to it.

We note that the *Batson/Wheeler* framework was superseded by statute in 2020 with the enactment of Assembly Bill No. 3070 (Stats. 2020, ch. 318), which codified new antidiscrimination rules governing jury selection under Code of Civil Procedure section 231.7, effective in criminal cases January 1, 2022 (see *id.*, § 231.7, subd. (k), added by Stats. 2020, ch. 318, § 2), and in civil cases Jan. 1, 2026 (§ 213,7, added by Stats. 2020, ch. 318, § 3). Section 231.7 makes no mention of the need for a prima facie showing of purposeful discrimination and simply says that "upon objection . . . based on this section" (*id.*, subd. (c)), the party exercising a peremptory challenges "shall state the reasons the challenge [was] . . . exercised" (*ibid.*). Section 231.7 changes the standard of review of trial court rulings denying objections of discriminatory use of peremptory challenges from substantial evidence to de novo review. (*Id.*, subd. (j).) It also provides a list of 13 presumptively invalid reasons, many of which have been accepted in the *Batson/Wheeler* case law as neutral (e.g., having had a negative experience with law enforcement officers (*id.*, subd. (e)(1)); expressing a belief that law

**B.** *Conclusive Presumption or Directed Verdict by Admission of Evidence of the Prior* Watson *Admonitions*

Wilson contends that by allowing the People to introduce evidence of the prior *Watson* admonitions given to him, the court effectively created a conclusive presumption and directed a verdict in violation of due process.[6] (U.S. Const., 14th Amend.)  This claim was not preserved for appeal.  Wilson did not object to the evidence on the ground he asserts here.  His only objections were that it was irrelevant, cumulative, and more prejudicial than probative under Evidence Code section 352.  At no point did Wilson's trial counsel argue the evidence created a "conclusive presumption" that driving under the influence is dangerous or "directed a verdict" on implied malice murder.  His claim is therefore forfeited.  (Evid. Code, § 353.)  (See fn. 6, *ante*.)

Wilson's Evidence Code section 352 objection did not preserve the issue he now raises.  In *People v. Partida* (2005) 37 Cal.4th 428, the defendant objected to evidence as being more prejudicial than probative.  (*Id.* at p. 431.)  On appeal, he argued that admission of the evidence violated his right to due process.  (*Ibid*.)  *Partida* held the defendant could "argue that the asserted error in overruling the trial objection had the legal consequence of violating

_____

enforcement officers engage in racial profiling (*id.*, subd. (e)(2)); the prospective juror's manner of dress, attire, or personal appearance (*id.*, subd. (e)(9)); the prospective juror's lack of rapport, body language or demeanor (*id.*, subd. (g)(1) (B)); or the prospective juror's answers showed lack of intelligence or confusion (*id.*, subd. (g)(1)(C)).  Section 231.7 had not been enacted at the time this case was tried, but even had it been in force, we find it notable that the reasons that the prosecutor placed on the record for having exercised the challenged peremptory challenges here would not have been presumptively invalid under this new scheme.

[6] The *Watson* admonitions were not the subject of independent discussion—or independent objection—in the trial record.  This further supports our finding of forfeiture.

21

due process." (*Ibid*.; see *id*. at pp. 435–436.) The defendant's claim "that due process required the court to exclude the evidence for a reason not included in the trial objection" was forfeited. (*Id*. at p. 431; see *id*. at p. 438 [such assertion "is not cognizable"].) Under *Partida*, Wilson's due process claim is preserved to the extent he argues the evidence was more prejudicial than probative. But that is not what Wilson argues. Rather, he claims admission of the evidence violated due process by creating a conclusive presumption or directed verdict. That claim is forfeited because Wilson did not object to the evidence on that ground in the trial court. (*People v. Arredondo* (2019) 8 Cal.5th 694, 710.)

Wilson also contends "the trial court's ruling was based on existing California law, thereby rendering any due process objection futile." Indeed, California trial courts have routinely admitted prior *Watson* admonitions as evidence that the defendant knew of the danger to life posed by drunk driving and consciously disregarded the risk. (*People v. Felix* (2019) 41 Cal.App.5th 177, 185 [defendant's knowledge of dangerousness of driving drunk may be obtained " 'from the admonition required by Vehicle Code section 23593 upon a DUI-related conviction' "]; e.g., *Munoz, supra*, 31 Cal.App.5th at p. 149; *People v. Lopez* (2019) 31 Cal.App.5th 55, 59; *People v. Yushchuk* (2018) 28 Cal.App.5th 120, 123.) In any case, the issue before the court was not whether the admonitions separately were admissible, but whether Wilson's driving history as a whole was admissible. Wilson reasons that trial counsel was not required to make futile objections to preserve a claim of error. But he does not explain how the existence of California law on the admissibility of driving history evidence in a DUI trial excuses trial counsel from failing to

22

object to a perceived violation of the federal Constitution.[7] Wilson's claim is forfeited.

More fundamentally, this was an evidentiary ruling, not a jury instruction or a comment from the bench. Indeed, almost all of Wilson's factual argument on this issue consists of quoting the *prosecutor's* closing argument to the jury. But instead of accusing the prosecutor of misconduct,[8] Wilson recasts the issue as one of judicial error by citing a string of cases forbidding courts to direct a verdict or create a conclusive presumption. (*Yates v. Aiken* (1988) 484 U.S. 211, 214–217 [burden-shifting jury instruction]; *Rose v. Clark* (1986) 478 U.S. 570, 578–581 [directed verdict per se reversible, whereas jury instruction shifting burden of proof subject to harmless error analysis]; *People v. Flood* (1998) 18 Cal.4th 470, 501–503 [jury instruction removing one element from jury subject to harmless error analysis]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 501–503 [jury instruction that " '[h]omicide is a reasonable and natural consequence to be expected in a gang attack' " (italics omitted) was improper because it "deprive[d] the defendant of the right to a jury determination of relevant factual issues"; error not harmless under *Chapman* standard (*Chapman v. California* (1967 386 U.S. 18 (*Chapman*)]; *People v. Beltran* (2007) 157 Cal.App.4th 235, 240, fn. 4, 245–248 [court gave instruction allowing jury to find defendant had BAC of .08 percent while driving if two tests

---

[7] Wilson makes no claim in his opening brief that his trial counsel was constitutionally ineffective for failing to object. Any such suggestion in his reply brief comes too late. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 255.)

[8] Any potential claim of prosecutorial misconduct was forfeited by failure to object and request an admonition. (*People v. Jackson* (2016) 1 Cal.5th 269, 367.)

administered within three hours thereafter showed BAC of .08 percent or more; held, instruction, though framed as permissible inference, should not have been given in case involving "rising alcohol defense"; error not harmless under *Chapman*]; see Veh. Code, § 23153, subd. (b) [statutory source of erroneous instruction in *Beltran*, calling the rule a "rebuttable presumption" (*Beltran*, at p. 241)].)

We do not doubt the rule espoused by Wilson or its application in the cited cases. We note, however, that none of the cited cases found constitutional error of this type in the mere admission of evidence. Rather, a misguided jury instruction was involved in each case. Thus, an utterance from the bench has been recognized as creating an impermissible mandatory presumption when it removes an issue from the jury (see *People v. Godinez, supra*, 2 Cal.App.4th at pp. 501–503; *People v. Beltran, supra*, 157 Cal.App.4th at pp. 240, fn. 4, 245), but Wilson fails to convince us that the admission of evidence which leads the jury by *logical inference* to the finding of an elemental fact is likewise error. The general rule is that an error in admitting evidence does not violate due process unless it renders the trial fundamentally unfair. (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329, fn. 8; *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.) Wilson's trial was not fundamentally unfair.

Responding to the Attorney General's argument that the challenged ruling was an evidentiary one, not a jury instruction, Wilson contends the conclusive presumption inheres in the *Watson* admonition itself, regardless of how it came before the jury. The admonition itself, however, does not create a mandatory presumption. "A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action. A presumption is not evidence." (Evid.

Code, § 600, subd. (a).) "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (*Id.*, subd. (b).) The *Watson* admonition does not provide that any particular fact follows from its warning of dangerousness, except that one who drives drunk and kills someone "can be charged with murder," which is a simple statement of the *Watson* holding, a "question of law not open to dispute." (*People v. Godinez, supra*, 2 Cal.App.4th at p. 502.)

Wilson argues: "Implied malice murder has a physical component (the nature of the act) and a mental component (the defendant's mental state). [Citations.] 'The physical component is satisfied by the performance of " 'an act, the natural consequences of which are dangerous to life.' " ' " "The *Watson* admonishment," he continues, "especially when linked to a Vehicle Code statute, created a conclusive presumption and directed verdict regarding the physical component of implied malice." In other words, Wilson argues that evidence of the prior admonitions *compelled* the jury to find his driving was dangerous to life. It did not. In fact, no special instruction was given on the jury's appropriate use of the *Watson* admonitions at all, but the jurors were told to use the uncharged conviction evidence in general only to prove "knowledge" or "motive."

Proof of the admonitions raised a strong *inference* that Wilson was aware of the risk to human life, which in turn supported a finding of the elemental fact that he acted in conscious disregard of that risk, but no true *presumption*, conclusive or otherwise, was involved. (See *People v. Yushchuk, supra*, 28 Cal.App.5th at pp. 126–130 [distinguishing presumptions from inferences]; *People v. Beltran, supra*, 157 Cal.App.4th at pp. 240–244 [same].)

Wilson argues drunk driving is *not* extremely dangerous, insisting that "[d]riving under the influence occurs on a daily basis without accident, injury, or death." That's like saying Russian roulette is not dangerous to human life because five out of six times when the trigger is pulled no one gets hurt. That drunk driving is dangerous to human life is not subject to serious dispute and has long been recognized by the California courts. (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 262 ["The drunk driver cuts a wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California and the nation."]; *People v. Duroncelay* (1957) 48 Cal.2d 766, 772 ["The incidence of death and serious injury on the highways has undeniably assumed tragic dimensions and has been due in a significant degree to the effects of alcohol upon drivers."]; *Helmandollar v. Department of Motor Vehicles* (1992) 7 Cal.App.4th 52, 57 ["numerous, dangerous, and deadly risks associated with drinking and driving"].)

That said, the *Watson* admonitions did not create a conclusive presumption that *Wilson's actual* driving was dangerous to human life. On that issue, the court instructed the jury, "If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence." Wilson's speed and his loss of control of the vehicle were sufficient to prove beyond a reasonable doubt his driving was dangerous to human life. There is no reason to suspect that the jurors overlooked these facts in reaching their guilty verdicts or that they acted on a conclusive presumption instead of evidence. (See *People v. Ortiz*, *supra*, 109 Cal.App.4th at pp. 112–113, 115–116 [grossly reckless driving, known to the defendant to be dangerous, may form the basis of a murder conviction, even if alcohol is not involved].)

26

The *Watson* admonitions were just one piece of evidence showing Wilson's knowledge of the danger of drinking and driving. Evidence of his prior experiences with DUI prosecutions, convictions, and consequences laid out for the jury a picture of a man who had been warned repeatedly, not just by the admonitions, but by his entire experience in the legal system, as explained by the trial judge in ruling on the prosecutor's in limine motion: Wilson's consequences "includ[ed] being placed on probation, being sentenced to jail, having fines imposed, being ordered to participate in a DUI program, having [his] license restricted or suspended and having an interlock device placed on [his] car or ordered to be placed on [his] car[. These] are all sanctions that communicate to a person with driving under the influence convictions that this conduct is extremely dangerous." Yet, Wilson does not challenge the admissibility of the prior conviction evidence or any of the rest of the driving history evidence. He alleges error only in the admission of the *Watson* admonitions.

The jury certainly was not compelled by the *Watson* admonitions to find Wilson had consumed alcohol before or while driving on the night in question. The jury's findings of guilt on counts 1 and 2 depended upon their evaluation of evidence distinct from the *Watson* admonitions and in addition to Wilson's driving history, including the selfies Wilson took 48 minutes before the crash depicting himself in the driver's seat of his SUV holding an open, half empty mini-bottle of Barefoot wine, and the expert's testimony about his reconstructed BAC at the time of driving. The trial judge did not err in admitting exhibits 32 to 42 and the accompanying expert DMV testimony for the limited purpose of supporting a finding of knowledge or motive. The judge expressly relied on a slew of appellate cases in granting the

27

prosecutor's in limine motion.[9]  No separate objection was raised to the *Watson* admonitions within those exhibits and testimony, nor was a special instruction on the jury's use of the admonitions requested by the defense. (See fn. 6, *ante*.)

Even assuming admission of evidence of the *Watson* admonitions violated due process by creating a conclusive presumption that DUI is dangerous to human life, the error was harmless beyond a reasonable doubt, for the jurors knew drunk driving was dangerous before ever setting foot in the courtroom.  (See *Rose v. Clark, supra*, 478 U.S. at pp. 579–581 [applying harmless error rule of *Chapman, supra*, 386 U.S. 18 (*Chapman*) to erroneous jury instruction that created a presumption]; *People v. Vanegas* (2004) 115 Cal.App.4th 592, 602 [same].)  Even without evidence of a *Watson* admonition, it is commonly understood that driving under the influence of alcohol is dangerous.  (*Missouri v. McNeely* (2013) 569 U.S. 141, 160 [" 'No one can seriously dispute the magnitude of the drunken driving problem' "]; *People v. Brogna, supra*, 202 Cal.App.3d at p. 709 [that drunk driving is "inherently dangerous" is a "simple fact [that] has been made well known to all segments of our society through virtually every form of mass media"].) Our Supreme Court has even said a defendant is "presumed [to be] aware of the hazards of driving while intoxicated." (*Watson, supra*, 30 Cal.3d at p. 300.)

---

[9] The court relied on:  *People v. Moore* (2010) 187 Cal.App.4th 937, 943; *People v. Ortiz* (2003) 109 Cal.App.4th 104, 113; *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1850, disapproved on other grounds in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3, overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229; *People v. Johnson* (1994) 30 Cal.App.4th 286, 291–292; *People v. Murray* (1990) 225 Cal.App.3d 734, 746; *People v. Brogna* (1988) 202 Cal.App.3d 700, 709, and *People v. McCarnes* (1986) 179 Cal.App.3d 525, 534.

The jury's guilty verdict on the charged DUI (count 3) reflects its finding that Wilson had consumed alcohol, resulting in his "mental or physical abilities" becoming "so impaired" that he was "no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances." Moreover, the evidence showed that Wilson had been speeding on the night of the collision—driving 83 miles per hour when the highest speed at which the off-ramp could safely be negotiated was 51 miles per hour—and that he failed to negotiate the off-ramp safely, which was a "major factor" in the collision. He thus violated at least two sections of the Vehicle Code on the off-ramp before losing control of his vehicle: exceeding the basic speed limit (Veh. Code, § 22350) and making an unsafe turning movement (Veh. Code, § 22107). Given this overwhelming evidence that Wilson's driving was dangerous to human life, any error in admitting the *Watson* admonitions was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)

## C. *Wilson's Hearsay Issue Is Forfeited*

Wilson's final argument about the inadmissibility of the *Watson* admonitions is that they were hearsay under California law, and specifically under *Sanchez, supra*, 63 Cal.4th 665, and their admission deprived him of his Sixth Amendment right to confrontation. He did not interpose a hearsay or confrontation clause objection at trial, however, thereby forfeiting his present claim. (Evid. Code, § 353; *People v. Clark* (2016) 63 Cal.4th 522, 574 [hearsay]; *People v. Arredondo, supra*, 8 Cal.5th at p. 710 [confrontation clause].) Nor did Wilson raise hearsay or confrontation clause grounds in opposing the prosecutor's in limine motion. And the trial postdated both *Sanchez* and *Crawford v. Washington* (2004) 541 U.S. 36, which leaves Wilson without an argument that objection would have been futile. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 911 [forfeiture applied in

post-*Crawford* case]; cf. *People v. Perez* (2020) 9 Cal.5th 1, 9 ["failure . . . to object at trial before *Sanchez* was decided did not forfeit a claim on appeal based upon *Sanchez*"]; *People v. Rangel* (2016) 62 Cal.4th 1192, 1215 ["in a case tried before *Crawford*, a defendant does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial"].) Wilson's hearsay argument is foreclosed by forfeiture.

## D. *Vehicular Manslaughter Offenses as Lesser Included Offenses to Murder*

Part of the instructional conference occurred off the record, but Wilson maintains that the judge's summary afterwards shows his trial attorney requested jury instructions on three lesser offenses: vehicular manslaughter (Pen. Code, § 192, subd. (c)), vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), and gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)).[10] The trial judge determined the vehicular manslaughter offenses were lesser *related* offenses and refused the instructions upon the prosecutor's objection. Applying a de novo standard of review (*People v. Waidla* (2000) 22 Cal.4th 690, 733), we hold this decision was correct (see, e.g., *People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1057–1059).

A trial court must instruct sua sponte on lesser included offenses supported by substantial evidence, even if the defendant objects for tactical reasons. (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155 [superseded on another ground by amendment of Pen. Code, § 189 not relevant here]; see

---

[10] Because the instructions were initially discussed informally and not reported, it is not clear to us from the record that defense counsel actually requested all three instructions. We treat inclusion of the instructions identically, however, so we accept for purposes of our discussion the characterization by Wilson's appellate counsel.

Pen. Code, § 1159.)  The rule is intended to prevent the strategy, ignorance, or mistakes of either party from presenting the jury with an unwarranted all-or-nothing choice, to encourage a verdict no harsher or more lenient than the evidence merits, and to protect the jury's truth-ascertainment function. (*Breverman*, at p. 155.)  On the other hand, if a lesser offense is determined to be only a lesser related offense, the court is prohibited to instruct on it unless both parties agree.  (*People v. Jennings* (2010) 50 Cal.4th 616, 668; *People v. Birks* (1998) 19 Cal.4th 108, 136 (*Birks*).)  The *Birks* rule is grounded in the separation of powers and in the belief that a contrary rule gives the defendant an unfair advantage at trial.  (*Birks*, at pp. 116–136 [overruling *People v. Geiger* (1984) 35 Cal.3d 510].)

A lesser offense is necessarily included within a charged offense "if under the statutory definition of the charged offense it cannot be committed without committing the lesser offense, or if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed." (*People v. Geiger*, *supra*, 35 Cal.3d at p. 517, fn. 4.)  " 'The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater.' " (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)  A lesser related offense differs in that it requires proof of at least one element not included in the greater alleged offense.  (*People v. Hicks* (2017) 4 Cal.5th 203, 209 [defendant tried for murder and found guilty of gross vehicular manslaughter while intoxicated could be retried for murder because the conviction was on a lesser related offense]; *Birks*, *supra*, 19 Cal.4th at pp. 119–120.)

Wilson argues the three vehicular manslaughter offenses were lesser included offenses of murder under the accusatory pleading test. The information alleged murder, incorporating the statutory definition, with no elaboration as to how the murder was committed and no additional facts alleged.[11] There was no allegation that a car or drunk driving was involved. We therefore *must* apply the statutory elements test to decide Wilson's claims of instructional error. (*People v. Robinson, supra*, 63 Cal.4th at p. 207; *People v. Fontenot* (2019) 8 Cal.5th 57, 65.) The accusatory pleading test is inapplicable and offers no support for a different outcome.[12]

"[A] defendant has no unilateral right to an instruction on an uncharged offense that is not necessarily included within the charged offense." (*People v. Yeoman* (2003) 31 Cal.4th 93, 129.) The Supreme Court in *People v. Sanchez, supra*, 24 Cal.4th 983 held vehicular manslaughter

---

[11] The information alleged: "On or about June 30, 2017, in the County of Contra Costa, State of California, the crime of Murder in violation of PC187(a) (PC1203.075), a Felony, was committed in that [Wilson] did unlawfully, and with malice aforethought murder [Lorenzo in count 1 and Vincent in count 2], a human being."

[12] Wilson posits that evidence at the preliminary hearing must be considered in applying the accusatory pleading test. This is a view championed by the Sixth District in *People v. Ortega* (2015) 240 Cal.App.4th 956, 968, which proclaimed that "the accusatory pleading cannot be examined in isolation." Due process, *Ortega* says, "requires that the facts derived from the preliminary hearing be factored into the accusatory pleading analysis." (*Ibid*.)

The Supreme Court, however, has never accepted this enlargement of the scope of the accusatory pleading test. (*People v. Montoya* (2004) 33 Cal.4th 1031, 1036 ["to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider only the pleading for the greater offense"].) Because *Ortega* endorses a different protocol, we refuse to follow it, as have other courts on similar facts. (*People v. Alvarez* (2019) 32 Cal.App.5th 781, 787–789; *People v. Munoz* (2019) 31 Cal.App.5th 143, 155–158; see *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1038–1039.)

while intoxicated is not a lesser included offense to murder because it "requires proof of elements that are not necessary to a murder conviction. The use of a vehicle while intoxicated is not merely a 'circumstance,' but an element of proof when the charge is gross vehicular manslaughter while intoxicated. Gross vehicular manslaughter while intoxicated is not merely a degree of murder, nor is it a crime with a lengthy pedigree as a lesser included offense within the crime of murder." (*Id*. at p. 991.) Therefore, it "should not be treated as a lesser included offense to murder." (*Id*. at p. 992.)

For the same reason, all forms of vehicular manslaughter are lesser *related* offenses to murder. (See *People v. Bettasso*, *supra*, 49 Cal.App.5th at pp. 1057–1059 [vehicular manslaughter, Pen. Code, § 192, subd. (c)]; *People v. Alvarez*, *supra*, 32 Cal.App.5th at p. 790 [gross vehicular manslaughter while intoxicated]; *People v. Munoz*, *supra*, 31 Cal.App.5th at pp. 155–158 [gross vehicular manslaughter while intoxicated]; *People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1116 [gross vehicular manslaughter].) The prosecutor's objection precluded the judge from acceding to Wilson's request for the vehicular manslaughter instructions.

### E. *Battery as a Lesser Included Offense to Count 3*

Count 3, the only alcohol-related count, charged Wilson with causing injury while driving under the influence of alcohol (Veh. Code, § 23153, subd. (a)) and personally inflicting great bodily injury (Pen. Code, § 12022.7, subds. (a) & (b)) on more than one victim (Veh. Code, § 23558), within 10 years of suffering a prior DUI conviction (Veh. Code, § 23560). Wilson contends the court should have instructed sua sponte on simple battery (Pen. Code, § 242) as a lesser included offense. Not so.

Battery is statutorily defined as "any willful and unlawful use of force or violence upon the person of another." (Pen. Code, § 242.) Thus, the crime of battery has two elements: (1) a use of force or violence that is (2) willful

and unlawful.  (*People v. Miranda* (2021) 62 Cal.App.5th 162, 173, review granted June 16, 2021, S268384.)  The first element is satisfied by any touching (*People v. Rocha* (1971) 3 Cal.3d 893, 899, fn. 12, abrogated on other grounds in *People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1189), but no such touching is required under Vehicle Code section 23153, subdivision (a).

A person can drive under the influence and "proximately cause" injury, as is required for a DUI with injury (Veh. Code, § 23153, subd. (a)) without applying force to another person, as is required for battery.  Consider a drunken driver who runs a stop sign and negligently cuts in front of another car, which swerves around him and hits a barrier, injuring that car's driver.  The drunken driver has violated Vehicle Code section 23153 by proximately causing the victim's injuries.  (See *People v. Bland* (2002) 28 Cal.4th 313, 335 [defining proximate causation].)  CALCRIM No. 2100, defining an act as a cause "if the injury is the direct, natural, and probable consequence of the act and the injury would not have happened without the act," was given in this case.

In the foregoing scenario, however, the drunk driver has not applied "force or violence upon the person" of the victim and therefore has not committed battery.  (See *People v. Marshall* (1997) 15 Cal.4th 1, 38 ["a battery cannot be accomplished without a touching of the victim"].)  Thus, a violation of Vehicle Code section 23153 does not necessarily result in a violation of Penal Code section 242.  Nor was there any pleading of the offense that would have made battery a lesser included offense.  Accordingly, the trial judge was not obligated to instruct the jury sua sponte on battery.  And in any case, employing a *Watson* standard of review (*People v. Hicks*, *supra*, 4 Cal.5th at p. 215), we find no reasonable probability Wilson would

have been convicted solely of battery on count 3, even if a battery instruction had been given.

## F. *Adequacy of Definition of the Phrase "Personally Inflicts" Great Bodily Injury (CALCRIM Nos. 3160 and 3161)*

Next, Wilson claims the trial judge misinstructed the jury on what it means to "personally inflict[] great bodily injury" under Penal Code section 12022.7, subdivisions (a) and (b) by not further defining the phrase "personally inflicts." We reject his contention for three reasons.

First, he did not request a modification of the standard CALCRIM instructions (CALCRIM Nos. 3160 & 3161) and thereby forfeited any claim of error on appeal. A trial court is not required to define a phrase in a pattern instruction that incorporates statutory language and is understandable in ordinary everyday meaning, correct in law, and responsive to the evidence, unless a litigant requests modification. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 901, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1348, abrogated on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 100; *People v. Johnson* (1993) 6 Cal.4th 1, 52 [failure to request clarifying instruction bars appellate review], overruled on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826.)

Second, no specialized legal definition of "personally inflicts" was needed to clearly convey the concept to the jury. According to Wilson, the statutory element of "personally inflict[ing] great bodily injury" has a "legal definition." The phrase "applies only to a person who himself inflicts the injury." (*People v. Cole* (1982) 31 Cal.3d 568, 572.) "Personally inflict" means " 'done in person,' " " 'direct from one person to another.' " (*Id.* at p. 572.) "To 'personally inflict' an injury is to directly cause an injury, not just to proximately cause it." (*People v. Wilson* (2013) 219 Cal.App.4th 500, 511–

512; accord, *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 348–349.) We do not disagree with these quoted passages, but we think these elaborations are clear from the statutory language itself, carried over into CALCRIM Nos. 3160 and 3161. "When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574.)

The Supreme Court has decided there is no technical or specialized legal meaning for the phrase "personally inflicts"; its statutory meaning is the same as its nonlegal meaning. (*People v. Cross* (2008) 45 Cal.4th 58, 67–68 (*Cross*); *People v. Cole, supra,* 31 Cal.3d at p. 572; see *People v. Ollo* (2021) 11 Cal.5th 682, 687–688.) *People v. Modiri* (2006) 39 Cal.4th 481, 493 defined the term as follows: "Commonly understood, the verb, 'to inflict,' means 'to lay (a blow) on: cause (something damaging or painful) to be endured: impose.' [Citation.] . . . [¶] The term 'personally,' which modifies 'inflicts' . . ., refers to an act performed 'in person,' and involving 'the actual or immediate presence or *action of the individual person himself (as opposed to a substitute, deputy, messenger, etc.*).' " (Italics added.) The trial judge had no duty to define the phrase further in this case.

We see no reasonable likelihood the jurors would have misunderstood the instruction as allowing them to find the enhancement true so long as Wilson *proximately caused* great bodily injury, as Wilson now suggests. The court's instruction on proximate cause for establishing the substantive count 3 violation, viewed in the context of the whole charge to the jury, would not have confused the jurors or tainted the clarity of the court's "personally inflicted" instruction on great bodily injury for the charged enhancements.

36

Third, even if we assume trial court error, the instructional omission was harmless under any standard. (*Chapman*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) There was no evidence suggesting that any person or force other than Wilson played a role in causing the collision that killed Vincent and Lorenzo and gravely injured Luciano and Aida Reyes. Even if the jurors had been given a fuller definition of "personally inflicts" under the statute, it is clear beyond a reasonable doubt they would not have reached verdicts more favorable to Wilson on the great bodily injury enhancements. (*Chapman*, at p. 24.)

### G. *The Great Bodily Injury Findings Under Penal Code Section 12022.7, Subdivision (a) Are Supported by Substantial Evidence*

Wilson argues that both count 3 true findings on enhancements under Penal Code section 12022.7, subdivision (a) relating to Luciano and Aida Reyes should be reversed because "there is no evidence and/or substantial evidence that Wilson personally inflicted great bodily injury within the meaning of the statute and case law." In conclusory fashion, Wilson asserts, "The evidence is sufficient to establish that Wilson's act of driving proximately caused great bodily injury and death, but there is no evidence or substantial evidence that he personally inflicted great bodily injury or death, i.e.[,] he 'himself inflict[ed] the injury,' 'direct from one person to another.' " To the extent he implies the enhancement statute requires some greater degree of person-to-person or skin-to-skin contact or some greater degree of willful contact than shown by the evidence in this case, we reject his suggestion. (See *Cross*, *supra*, 45 Cal.4th at p. 66, fn. 3 ["To the extent defendant argues that great bodily injury invariably requires the application of physical force to the victim in order to cause great bodily injury, we reject that view"]; *People v. Guzman* (2000) 77 Cal.App.4th 761, 764 [defendant

personally inflicted injury by turning his vehicle into oncoming traffic and causing collision].)

Wilson's analysis fails to persuade us because the great bodily injury enhancements are supported by overwhelming evidence of serious and deadly injuries, and Wilson's conduct meets the "personally inflicts" requirement. The evidence shows the injuries were inflicted by Wilson's conduct alone. This counts as substantial evidence of personal infliction even though vehicles were involved. (See *People v. Guzman, supra*, 77 Cal.App.4th at p. 764.)

## H. *No Substantial Evidence Supports the Jury's True Findings Under Penal Code Section 12022.7, Subdivision (b) that Lorenzo and Vincent Were Rendered "Comatose Due to Brain Injury" Before They Died*

Unlike their findings on the allegations under Penal Code section 12022.7, subdivision (a), the jury's true findings on the two enhancements alleged under subdivision (b) of the same statute, namely that Wilson had inflicted injuries rendering Lorenzo and Vincent "comatose due to brain injury," were unsupported by substantial evidence. No one testified that Lorenzo and Vincent were "comatose" before they died, and the expert witness did not opine as to how long they survived their injuries, except that both expired rapidly. Most of the first witnesses to appear on the scene believed the two older boys were dead even when they first arrived, although one Kinder's employee thought Vincent was still alive. The CHP and EMT personnel extended no CPR efforts for Lorenzo and worked on Vincent only for "a few seconds" according to an onlooker.

Since the statute does not define "comatose," the word conveys "the meaning it bears in ordinary usage," that is, in a state "characterized by profound unconsciousness." (*People v. Cunningham* (2016) 244 Cal.App.4th 1049, 1054.) Although the word "comatose" does not imply the victim must

38

be in a permanent unconscious state, something more than a fleeting and unsubstantiated state is anticipated. There must be evidence showing the victim was comatose at some point in time. (*Id*. at pp. 1053–1054.)

The Attorney General concedes "no significant evidence" supports the jury's findings but argues we should reduce the (b) enhancements to (a) enhancements, which carry a three-year term, stayed under Penal Code section 654. We decline to take that approach and shall strike the enhancements imposed under Penal Code section 12022.7, subdivision (b), and the sentences imposed thereon (five years each, stayed under Pen. Code, § 654).

## I. *Penal Code Section 654 Does Not Bar Separate Punishment for Fleeing the Scene of an Accident*

Wilson contends Penal Code section 654, subdivision (a) prohibited the trial court from imposing sentence both on the murders and the DUI with injury on the one hand, and on the fleeing statute on the other. His theory is essentially that one who commits a serious crime will naturally try to escape punishment and therefore cannot be punished separately for fleeing the scene of the crime.

Penal Code section 654, it is true, bars multiple punishment for "a course of conduct" reflecting a single "intent and objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311–312 (*Corpening*).) "Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*Corpening*, at p. 311.) Whether the defendant entertained a single or multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if any substantial evidence supports it. (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092,

39

1113; *People v. Butler* (1986) 184 Cal.App.3d 469, 473 (*Butler*).) Moreover, the trial court's finding may be either express or implied. (*People v. McCoy* (1992) 9 Cal.App.4th 1578, 1585.) But when the question arises on undisputed facts, as it does here, application of Penal Code section 654 is an issue of law which we review de novo. (*Corpening*, at p. 312.)

Wilson fails to convince us the collision and his flight occurred as a course of conduct incident to a single intent and objective. On the contrary, the mental state required for the murders (conscious disregard of risk to human life) and the conduct required for the DUI offense in count 3 (driving while intoxicated) were separate and distinct from the decision to try to escape, formed after the collision, which involved a wholly separate act, inferably for the separate purpose of concealing evidence of Wilson's drunkenness and minimizing his punishment. (See *Butler*, *supra*, 184 Cal.App.3d at p. 474.)

In *Butler*, a case much like this one, the defendant was convicted of vehicular manslaughter (Pen. Code, former § 192, subd. (c)(3)) and felony hit-and-run (Veh. Code, former § 20001). After speeding and running a stop sign and causing a fatal accident, Butler was found by an acquaintance wandering dazed near the accident. (*Butler*, *supra*, 184 Cal.App.3d at p. 471.) He prevailed upon the acquaintance to take him home. His BAC was not tested until three and one-half hours later when a relative took him to the hospital for treatment. At that point his BAC was still .13 percent. (*Ibid.*)

Butler, like Wilson, argued on appeal that Penal Code section 654 prohibited his being sentenced on both vehicular manslaughter and hit-and-run (Veh. Code, former § 20001). (*Butler*, *supra*, 184 Cal.App.3d at pp. 471–472.) The Court of Appeal rejected his argument, holding that

40

leaving the scene of the accident he had caused and the accident itself involved "two separate states of mind" and a "divisible course of conduct." (*Id*. at p. 473.) His decision to flee arose from an objective to conceal his identity and his state of inebriation. (*Id*. at p. 474.) The same is true here.

Wilson calls *Butler* "flat-out wrong." We disagree. Wilson's act of drunk and reckless driving was separate and distinct from his act of running away on foot to avoid apprehension. Hence, this is a "two-act case," with separate intents and objectives, subject to dual punishment under Penal Code section 654. (See *People v. Jones* (2012) 54 Cal.4th 350, 358 [criticizing *Butler* for its reliance on *In re Hayes* (1969) 70 Cal.2d 604, a one-act case overruled in *Jones*, but approving of the result in *Butler*].)

The trial judge's implied finding of separate and distinct objectives is consistent with *Butler* and is supported by substantial evidence, including Wilson's statement moments after the collision, "I got to get out of here," and his overnight disappearance. The trial judge implicitly found that Wilson entertained a separate intent and purpose for his flight, a finding well-supported in the record. We further conclude, as a matter of law, the judge correctly punished the two crimes separately, employing de novo review to what are essentially undisputed facts. (*Corpening*, *supra*, 2 Cal.5th at p. 312.)

After the deadly crash, Wilson not only abandoned Reyes and her children in a moment of urgent need and unimaginable grief, but he did so to conceal evidence and reduce his own exposure to punishment. He was justly punished for two separate crimes.

### III. DISPOSITION

Based on insufficiency of the evidence, the judgment is modified by reversing the jury's true findings on the two enhancements to count 3 alleged

41

under Penal Code section 12022.7, subdivision (b), and striking the enhancements and sentences imposed thereon (five years, stayed under Pen. Code, § 654). In all other respects the judgment is affirmed. The superior court shall prepare an amended abstract of judgment and shall forward certified copies to the Department of Corrections and Rehabilitation, the Department of Motor Vehicles, and appellate counsel.

_____
Streeter, J.

WE CONCUR:


_____
Pollak, P.J.


_____
Desautels, J.*

*People v. Wilson  A157485*

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43