Filed 10/12/18

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C081739 |
| Plaintiff and Respondent, | (Super. Ct. No. 62126825) |
| v. | |
| ANDREY YUSHCHUK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Placer County, Mark S. Curry, Judge. Affirmed.

Law Office of Victor Haltom and Victor S. Haltom, Retained Counsel for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Christopher J. Rench, Deputy Attorney General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part I.

1

The jury found defendant Andrey Yushchuk guilty of second degree *Watson* murder (see *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*)), misdemeanor drunk driving (DUI) and misdemeanor aggravated DUI (over 0.08 percent blood-alcohol content); it acquitted him of felony DUI-with-injury charges. (Pen. Code, § 187, subd. (a); Veh. Code, § 23152, subds. (a) & (b), 12353, subds. (a) & (b).) The trial court sentenced defendant to prison for an unstayed term of 15 years to life. Defendant timely filed this appeal.

Defendant contends (1) the trial court erred in denying his motion to acquit at the close of the People's case-in-chief and (2) the court misinstructed the jury regarding permissive inferences. We disagree and shall affirm.

## BACKGROUND

Although defendant claimed not to remember the crash, his primary theory at trial was that he had consumed a large amount of vodka *after* the crash, from a bottle that had been inside the car, previously unopened, while he was trapped in his car alone and in pain.

*Facts*

Defendant is a recidivist drunk driver. On the early morning of November 14, 2012, while again driving drunk, he crossed over the centerline of the road and caused a collision that killed Gabriel Rodriquez. A vehicle driven by Michael S. then hit Rodriguez's vehicle.[1] A vodka bottle missing 10 ounces was in defendant's vehicle and he smelled of alcohol. Defendant was trapped and had to be cut out of his vehicle.

Defendant had five prior convictions for drunk driving behavior between 1993 and 1996; four DUIs or DUI with priors and one reckless driving in lieu of DUI (wet reckless). (Veh. Code, §§ 23103/23103.5, 23152, subds. (a) & (b).) The parties

---

[1] The jury acquitted defendant on two counts alleging his drunk driving caused injury to Michael S.

2

stipulated that two peace officers would testify about two arrests leading to DUI charges in which defendant was involved in traffic collisions, once with a fence. When defendant renewed his driver's license in 2010, he would have received the standard "*Watson* admonition" required by statute (see Veh. Code, §23593, subd. (a)), which states in part that "it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. If you continue to drive while under the influence of alcohol or drugs, or both and, as a result of that driving someone is killed, you can be charged with murder." Defendant took an online traffic-school course in July 2009 that included a *Watson* admonition. A former manager for a drunk driving agency testified that a person who completed an 18-hour court-ordered DUI program--as defendant did in 1998--would learn that drunk driving was dangerous to human life.

Nikolay Gritsyuk testified he was defendant's close friend and business partner; he and defendant ran a janitorial business. After work the night before the collision he and defendant drank in a bar, then went to a liquor store where defendant bought vodka. They drank coffee and waited in a parking lot so Gritsyuk could sober up and would not smell of alcohol when he returned home, but both were intoxicated. They had discussed the dangers of drunk driving in the past. Gritsyuk asked defendant if he was "okay to drive" and defendant said he was.

In a prior statement to peace officers, Gritsyuk had said the pair decided not to drive after leaving the bar around midnight, that defendant had probably had beer and a shot or two, then they left and had food and coffee; at around 5:00 or 6:00 a.m. they left a 7-Eleven. In response to Gritsyuk's questioning, defendant had told Gritsyuk that defendant was "okay."

A criminalist testified defendant's blood sample (taken about two hours after the collision) tested at 0.14 percent. Most people "peak" within five to 15 minutes. Hypothetically, a 230-pound male who "guzzles" 10 ounces of 80-proof vodka would have a blood-alcohol level of 0.132 percent; a 240-pound male's level would be 0.126

3

percent. If that male had no alcohol in his system at 5:15 a.m. and drank 10 ounces of the vodka, by 6:15 a.m. he would have a level of about 0.108 percent; adding an extra half-hour to the interval would give a level of about 0.099 percent. Had he not had any alcohol for the prior two hours before the sample, his level would be 0.18 percent. If the male had *some* alcohol in his system at the time of the collision--but less than 0.08 percent--*and then* drank the vodka before the accident, a reading of 0.14 percent (or 0.145 percent, one of the non-rounded readings) could be achieved two hours later.

A retired CHP officer prepared a video recording of the roadway that approximated the lighting conditions present at the time of the collision. He described factors that might cause a driver to cross over a centerline including intoxication and curvature of the roadway. On cross-examination he testified there was no difficulty seeing the speed limit signs or yellow lines on this roadway.

Defendant's toxicologist retested defendant's blood sample and derived a blood-alcohol figure of 0.12 percent, which was consistent with the original 0.14 percent reading because he tested the sample long after the collision and the alcohol decreases in samples over time. It was possible, depending on when a hypothetical person drank 10 ounces of vodka, for the blood alcohol to have been rising after the hypothetical collision. Some permutations would involve having an alcohol level below 0.08 percent at the time of the collision.

Defendant testified and admitted five alcohol-related convictions, a DUI in 1993, a DUI in 1994 (with an accident), a wet reckless in 1995, and two felony DUIs in 1996. His testimony suggested he could not understand the DUI classes he had taken because he was not then fluent in English. He testified that had no memory of the events in question because of his injuries. He had told an insurance agent that he thought he and Gritsyuk drank vodka before they walked around to "wear off the effect," then he drove Gritsyuk home, but he testified that he had been guessing based on information the insurance agent gave him. When he renewed his license in 2010 he had not read all the

4

papers. He completed an online traffic school in 2009 because of a speeding ticket, but did not remember reading all the required material.

*Closing Arguments*

The prosecutor emphasized that this was a murder case and the jury was not required to reach lesser homicide offenses. She argued defendant knew drunk driving would likely cause death. She mentioned an instruction that permitted an inference about blood-alcohol levels (see Part II, *post*) and told the jury it could "hang your hat on that" in finding defendant's blood alcohol was over 0.08 percent when he was driving. She discussed facts relevant to defendant's impairment, including the partly empty vodka bottle, the odor of alcohol from his body, the lack of blood on the bottle given the lacerations on defendant's hands after the crash, and defendant's confinement due to collapse of the vehicle around him. She argued this evidence refuted the theory that defendant rapidly drank 10 ounces of vodka either just before or just after the crash and after he had recovered from the night's drinking. She also argued that the People had no burden to show any particular blood-alcohol level to support the murder charge, as both expert witnesses testified most people are impaired below 0.08 percent.

Defense counsel argued that not everybody who knows drunk driving is dangerous and causes a fatal accident is guilty of murder; this was not an all-or-nothing case and there were several lesser homicide offenses to consider. He invited the jury to consider whether defendant was intoxicated at the time of the crash, based on the missing 10 ounces of vodka that defendant may have drunk either shortly before the collision or to dull his pain after the collision, and counsel put more emphasis on the latter possibility. There was no evidence defendant committed any traffic infractions (e.g., weaving, speeding, etc.) other than crossing the centerline on a curve on a narrow road, consistent with the view that he was not intoxicated while driving, but became intoxicated either just before or just after the accident.

5

## DISCUSSION

### I

*Motion to Acquit*

Defendant first contends the trial court erred in denying his motion to acquit at the close of the People's case-in-chief. We disagree.

The People's theory of second degree murder was based on implied malice principles enunciated by our Supreme Court in *Watson*, *supra*, 30 Cal.3d 290:

> "We have said that second degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .' [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" (*Watson*, *supra*, 30 Cal.3d at p. 300.)

In reviewing whether the evidence at the time of the motion to acquit was sufficient to support a finding of implied malice, we apply the same standard as when reviewing the sufficiency of the evidence to support a conviction, that is, " ' "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose . . . is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review. [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)

In turn, the basic substantial evidence test is well settled, requiring that " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of

solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 504; see *People v. Raley* (1992) 2 Cal.4th 870, 891 [substantial evidence " ' "reasonably inspires confidence" ' "].)

Defendant's briefing either attacks or tries to weaken the *Watson* murder theory or draws factual inferences in his favor, disregarding the appropriate standard of review.  He asserts that:  "No evidence exists to support a finding that [the defendant] harbored malice aforethought at the time of the accidental collision of his vehicle . . ." or "from which one could draw reasonable inferences that a high probability of death was occasioned by [the defendant] driving his vehicle on the morning of November 14, 2012, and/or that [the defendant] actually perceived and appreciated any such risk of death."

This claim is partly based on defendant's view that unlike in many reported cases, his driving did not entail multiple instances of poor driving, but merely driving over the centerline; it also partly echoes defendant's motion to dismiss (Pen. Code, § 995) and motion to acquit, which were based on the view that he had to have acted with knowledge that what he was doing posed a high probability of *death*, not merely danger to human life.  He also proposed instructions to that effect.[2]

Taking the last point first, it is not necessary to instruct the jury that malice requires knowledge of a "high probability of death" because the equivalent formulation of "conscious disregard for human life" is now recommended.  (See *People v. Knoller*

---

[2]  The Attorney General claims it is not clear whether it was defense counsel who proposed amendments to the murder instruction that would incorporate the defense theory about the risk of death (CALCRIM No. 520) and that counsel did not request any pinpoint instructions.  Although the document containing the proposals does not show which party requested them, they were discussed at the instructional conference.  When the trial court rejected defense counsel's argument that CALCRIM No. 520 should be modified or that the proposed amendments should be given as pinpoint instructions, the court then stated "And you laid them out in writing, and they'll be part of the court record for the appellate review."  Thus, the record is sufficiently clear on this point.

(2007) 41 Cal.4th 139, 152; *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1221-1222; see also *Watson*, *supra*, 30 Cal.3d at p. 300.) The question on appeal therefore becomes whether there was substantial evidence of such conscious disregard. There was.

Defendant's contrary claim fails to view the evidence in the light most favorable to the People, which requires drawing all rational inferences in favor of the verdict. Viewed in that light, defendant's prior DUI convictions, the DUI and traffic classes he took, and the admonishments he received when he renewed his driver's license, show he knew of the risk to human life from drunk driving. "The cases have relied upon some or all of the following factors in upholding drunk driving-murder convictions: (1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.) Here although defendant's driving may not have been particularly dangerous, there was ample evidence defendant drove far above the legal limit, that he subjectively knew the risks to human life of drunk driving, and he formed the intention to drive drunk despite those risks. (See, e.g., *People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1115[3] [inference from DUI classes]; *People v. Olivas* (1985) 172 Cal.App.3d 984, 989 ["case-by-case approach"]; *People v. Brogna* (1988) 202 Cal.App.3d 700, 709 ["One who drives a vehicle while under the influence after having been convicted of that offense knows better than most that his conduct is not only illegal, but entails a substantial risk of harm to himself and others"]; cf. *People v. Contreras* (1994) 26 Cal.App.4th 944, 955 ["the absence of intoxication or high speed flight from pursuing officers does not preclude a finding of malice"].) Accordingly, the trial court did not err in denying the motion to acquit.

---

[3] Disapproved on another point by *People v. Hicks* (2017) 4 Cal.5th 203, 214, fn. 3.

II

*Instructions on Permissive Inferences*

Defendant attacks certain instructions that permitted the jury to draw inferences about his blood-alcohol level at the time of the collision.  We find no error.

The trial court instructed the jury (CALCRIM No. 590) that to find defendant was under the influence for purposes of the gross vehicular manslaughter charge it had to find that due to drinking alcohol his abilities were so impaired that he was "no longer able to drive a vehicle with the caution of a sober person using ordinary care under similar circumstances."  The jury was also instructed in part on permissive inferences.  The jurors were told:

> "If the People have proved beyond a reasonable doubt that the defendant's blood alcohol level was .08 percent or more at the time of the chemical analysis, you may, but you are not required to, conclude that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense.

> "If the People have proved beyond a reasonable doubt that a sample of the defendant's blood was taken within three hours of the defendant's driving and that a chemical analysis of the sample showed a blood alcohol level of .08 percent or more, you may, but you are not required to, conclude that the defendant's blood alcohol level was .08 percent or more at the time of the alleged offense."

One or both of these instructions were repeated in connection with vehicular manslaughter while intoxicated (CALCRIM No. 591), DUI causing injury (CALCRIM No. 2100), DUI with a blood-alcohol level of 0.08 percent causing injury (CALCRIM No. 2101), simple DUI (CALCRIM No. 2110), and DUI with a blood-alcohol level of 0.08 percent (CALCRIM No. 2111).

None of these inference instructions were given as to the murder count, as to which the jury was instructed (CALCRIM No. 520) that it had to find express or implied

9

malice as defined.[4] Nonetheless, defendant contends these instructions were improper for two reasons: (1) The trial court should have told the jury that these instructions *did not* apply to the murder count; and (2) once defendant introduced evidence contradicting the evidence supporting the instructions, there was no basis to give them.

As for the first point, when reviewing claims of instructional error, we ask "whether the defendant has shown a reasonable likelihood that the jury, considering the instruction complained of in the context of the instructions as a whole and not in isolation, understood that instruction in a manner that violated his constitutional rights. [Citations.] We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation, and we presume jurors can understand and correlate all instructions given." (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.) Because the jury was separately instructed on the elements of murder and instructed that to return a murder verdict it had to find malice as defined, there is no reasonable likelihood that the jury would have employed the inference instructions to supplant the malice instructions for purposes of murder liability.

As to the second point, we first note that although the *statutes* underlying the permissive inference instructions are phrased as rebuttable presumptions (Veh. Code, §§ 23152, subd. (b) ["it is a rebuttable presumption that the person had 0.08 percent or more . . . of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent . . . at the time of the performance of a chemical test within three hours after the driving"]; 23153, subd. (b) [same]), caselaw interprets these statutes only to permit *instruction* on permissible inferences, to avoid constitutional doubts. (See *Coffey v.*

_____

[4] The Attorney General argues this claim is forfeited. However, although trial counsel did not *orally* object to the instructions as they might implicate the second degree murder charge, his written proposed amendments to the instructions included language that explicitly excluded both manslaughter and murder from their ambit. We will address the instructional claim on the merits.

10

*Shiomoto* (2015) 60 Cal.4th 1198, 1209.)  The statutes have not been amended to conform to the caselaw.  This has resulted in some confusion, as we explain in more detail below.

In *People v. Roder* (1983) 33 Cal.3d 491, our Supreme Court held that the prosecution may not rest its case on a mandatory presumption (such as those set forth in the statutes described immediately above) unless "the basic fact proved *compels* the inference of guilt beyond a reasonable doubt." (*Id.* at p. 498, fn. 7.)  A mandatory presumption "tells the trier of fact that it *must* assume the existence of the ultimate, elemental fact from proof of specific, designated basic facts." *(Id.* at p. 498.)  Such presumptions generally run afoul of the prosecution's burden to prove guilt beyond a reasonable doubt because they limit "the jury's freedom independently to assess all of the prosecution's evidence in order to determine whether the facts of the particular case establish guilt beyond a reasonable doubt." *(Ibid.)*

Critically, *Roder* distinguished between a mandatory presumption and a permissive inference (such as those set forth in the instructions given in this case) that " 'leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof.' " *(People v. Roder, supra*, 33 Cal.3d at p. 498, quoting *Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.)  The latter is appropriate unless " 'there is no rational way the trier [of fact] could make the connection permitted by the inference.' " *(Ibid.*; see *Francis v. Franklin* (1985) 471 U.S. 307, 314-315 ["A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts"].)

Defendant conflates the rules about rebuttable presumptions with those of permissive inferences and argues the blood-alcohol permissive inference instructions are properly given only when the record contains *no* evidence inconsistent with the conclusion that a defendant's blood-alcohol concentration was falling at the time of the first test.  He argues that because here there was some evidence to support his claim the

11

level might have been rising at the time of the test, the instructions were inappropriate. In support of this argument, defendant relies on *People v. Moore* (1998) 65 Cal.App.4th 933 (*Moore*). To the extent that *Moore* can be read to support defendant's argument, we disagree with *Moore*, as have other courts in the 20 years since it was decided. *Moore* conflates rebuttable presumptions with permissible inferences, as defendant would have us do here.[5]

Moore's error was explained in detail in *People v. Beltran* (2007) 157 Cal.App.4th 235, a drunk driving case. Beltran, like defendant herein, argued that one of the blood-alcohol permissive inference instructions should not have been given where there was evidence rebutting the inference. *(Id.* at p. 240.) *Beltran* observed that the Bench Notes for CALCRIM Nos. 2100 and 2111 contained language indicating that the bracketed portion of the instruction relating to the permissive inference is only appropriate if there is no evidence to contradict the inference, similar to the CALJIC Use Note at issue in *Moore*. (*Beltran,* at pp. 242-243 & fn. 7.) *Beltran* held that *Moore* and the CALCRIM bench notes "fail[ed] to recognize the important legal distinction between mandatory presumptions and permissive inferences." *(Id.* at p. 243.)[6] The court noted that the

---

[5] *Moore* involved a charge of willful failure to care for a child. In part, the relevant statute provides that proof of omission of a parent to provide food, clothing, and shelter, is "prima facie evidence" that the omission "is willful and without lawful excuse." (Pen. Code, § 270.) *Moore* interpreted this part of the statute to create a mandatory presumption that would be infirm if presented to the jury, but found the relevant jury instruction (CALJIC No. 16.152) anticipated this point and was phrased in terms of a permissive inference and therefore giving that instruction was not *constitutional* error. (*Moore*, *supra*, 65 Cal.App.4th at pp. 937-938.) But *Moore* then held that because there was evidence that the omission to provide care was not willful, giving the permissive inference instruction was error. (*Id.* at pp. 938-939.)

[6] *Beltran* also pointed out that the "holding in *Moore* is particularly puzzling because the opinion specifically acknowledges that CALJIC No. 16.152 was originally drafted as a mandatory rebuttable presumption, but had to be changed to a permissive inference in order to conform to *Roder*. (*Moore, supra,* 65 Cal.App.4th at pp. 937-938.)

statutory alcohol presumption was rephrased as a permissive inference instruction in order to conform to *Roder,* but that the Bench Notes incorrectly retained the limitations reserved for mandatory rebuttable presumptions. *(Id.* at pp. 242-243 and fn. 7.) Instead, as a general matter, "permissive inferences do not shift the burden of production or lower the prosecution's burden of proof. Because they may or may not be drawn by the jury, they do not operate in an unconstitutionally pernicious manner. For these reasons, CALJIC No. 12.61.1 may be given regardless of whether there is other evidence admitted at trial 'rebutting' the inference." *(Id.* at p. 244.)

Although defendant cites *Beltran* for another point, he offers no explanation why *Beltran* was incorrect in its criticism of *Moore*.[7] We agree with *Beltran*. (See also 1 Kuwatch, Cal. Drunk Driving Law (2016) Trial Defense, § 9:114.3 ["*Beltran* concludes that both the subject Bench Note and [*Moore*] are based on a failure to recognize the legal distinction between a permissive inference and a rebuttable presumption"]; *id*., § 9:113.4.) Thus, the presence of conflicting evidence on the predicate question of whether there is sufficient evidence to trigger the inference instructions does not preclude giving the instructions.[8] If a jury finds the predicate facts not true, it will not apply the

---

Accordingly, the *Moore* court initially concluded that there was nothing 'facially wrong' with the revised instruction. *(Id.* at p. 936.)" (*People v. Beltran*, *supra*, 157 Cal.App.4th at p. 243.)

[7] The Attorney General cited *Beltran* and argued *Moore* was not correctly decided. Although we granted defendant's retained appellate counsel's two requests for additional time in which to file a reply brief, no such brief was filed.

[8] We observe that the Bench Note to CALCRIM No. 2101 still provides "The court **must not** give the bracketed paragraph that begins with 'If the People have proved beyond a reasonable doubt that a sample of' if there is evidence that the defendant's blood alcohol level was below 0.08 percent at the time of the test." (Bench Notes to CALCRIM No. 2101 (March 2018).) This Note is incorrect for the reasons set forth in this opinion.

inferences.  And even if it finds the predicate facts true, it is not *compelled* to apply the inferences, which are wholly permissive.

True, the *statutes* underlying such instructions create rebuttable presumptions, the application of which disappears "if evidence sufficient to negate the presumed fact is presented."  (*Coffey v. Shiomoto*, *supra*, 60 Cal.4th at p. 1210.)   But because the instructions (properly) do not, evidence negating the presumed fact will not vitiate the legitimate inferences set forth by such instructions.  (*Ibid.* [" 'inferences may nevertheless be drawn from the same circumstances that gave rise to the presumption in the first place' "].)

Accordingly, we reject the claim of instructional error in this case.[9]

## DISPOSITION

The judgment is affirmed.


/s/
Duarte, Acting P. J.

We concur:



/s/
Hoch, J.



/s/
Renner, J.

---

[9]  For this reason, we need not address defendant's claims of prejudice or that the prosecutor should not have referred to the presumptions in argument.