Filed 10/7/22  P. v. Moreno CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JESUS RODRIGUEZ MORENO,<br><br>        Defendant and Appellant. | A165845<br><br>(Kern County<br>Super. Ct. No. BF168564A) |

While driving drunk, defendant Jesus Rodriguez Moreno (Rodriguez) hit a utility pole and then hit and killed a pedestrian, 39-year-old David Rico. Rodriguez, who was 55 years old and had three prior convictions for driving under the influence (DUI), then drove away from the scene.  Soon afterward, he was found nearby, passed out in his car.  A jury convicted him of second degree murder, gross vehicular manslaughter while intoxicated, and hit-and-run causing death, all felonies, and driving with a suspended license, a misdemeanor.  It also found true allegations that Rodriguez fled the scene and had prior DUI convictions.  The trial court sentenced him to 20 years to life in prison.

On appeal, Rodriguez claims that his statements to law enforcement officials were admitted in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  We agree, because he was never adequately informed that an attorney would be appointed for him if he could not afford one.  We also

1

conclude that the error was prejudicial as to the felony convictions. Therefore, we reverse those convictions and remand for a new trial.[1]

I.<br>FACTUAL AND PROCEDURAL<br>BACKGROUND

### A. The Crash and Physical Evidence

Around 8:00 p.m. on Saturday, June 3, 2017, Rico told his mother he was going for a walk and left her home in Lamont. At approximately 9:40 p.m., a California Highway Patrol (CHP) officer, Ahearn Lucas, was dispatched in response to a report that a vehicle had hit a utility pole on State Route 184 (SR-184). SR-184 is a two-lane highway, running north to south, with "a nine-foot divided section" marked by double yellow lines that functions as a divider. Although the stretch of road at issue was not well-lit, on the night in question the weather was "clear and calm" and there were "no unusual conditions" such as potholes.

While Officer Lucas was en route, he received an updated report that a vehicle had hit a pedestrian. Upon arriving at the scene at 10:07 p.m., the officer discovered a deceased person, later identified as Rico. Rico was lying on the dirt shoulder of SR-184's northbound lane, several feet from the asphalt. He "had severe head trauma," and his leg appeared to be broken.[2]

---

[1] As a result of our disposition, we need not address Rodriguez's numerous other arguments for reversal, most of which allege evidentiary or instructional errors. We therefore deny his request for judicial notice of a document related to one of those claims. Although we mention some evidence Rodriguez claims was erroneously admitted, such as evidence of his level of intoxication, we do not thereby express an opinion on the merits of his challenges to that evidence.

[2] Rico's death certificate, which was admitted into evidence, stated that his cause of death was "blunt force head trauma." There was no testimony about his autopsy.

Plastic vehicle debris, including a side mirror, was scattered near his body. The location of the debris suggested that Rico was hit while he was "on the far right side of the shoulder" of the road, not "in the traffic lane."

A few blocks south on SR-184 from Rico's body, a wooden utility pole, which stood about 14 feet away from the road's northbound lane, had been "[shorn] off" near the base. About two hundred feet north of this pole, a vehicle bumper with the license plate attached was lying on the road's dirt shoulder near a second utility pole.[3]

Another CHP officer at the scene, Sergeant Cecil McKinty, discovered a trail of vehicle fluid on the ground. The trail began around the shorn-off utility pole, continued to the vehicle bumper, and "veer[ed] back into [SR-184's] northbound lane." The trail then "traveled from the northbound lane onto the asphalt shoulder and . . . continue[d] [to] where [Rico] was located." At one point, the trail went into the southbound lane, proof that the vehicle was used to commit a traffic violation by crossing the double yellow lines.

Sergeant McKinty followed the fluid trail as it traveled down several different streets. At approximately 10:27 p.m., less than two miles away from the crash scene, he located the trail's termination point under a Pontiac Aztek SUV parked on the road's shoulder.

"[A] large pool of . . . oil and fluid" was underneath the front of the Aztek. It was missing its passenger's-side mirror and its front bumper, and its back license plate matched the license plate on the bumper at the crash scene. The front of the vehicle, particularly its right corner, was significantly damaged. The right side of the windshield was badly cracked, and the damage appeared "consistent with a round object striking [it]." The vehicle's

---

[3] There was conflicting evidence about whether the vehicle hit the second utility pole, but this uncertainty does not affect our analysis.

hood likewise appeared to have struck "something . . . round and solid." DNA testing later established that a small amount of Rico's blood was on the outside of the passenger's-side B pillar, close to where it attached to the windshield.

### B. Evidence Related to Rodriguez's Condition

After Sergeant McKinty located the Aztek, he activated his emergency lights and parked behind it. When he approached the vehicle, he observed Rodriguez "slouched over" in the driver's seat and apparently "passed out." Rodriguez had an abrasion on his nose, likely caused by the deployed driver's airbag, and his blood was on the airbag. His shirt and undershirt were also bloody.

Sergeant McKinty reached through the Aztek's open window and shook Rodriguez's shoulder, but "it took [the sergeant] several seconds to get [Rodriguez] to actually wake up and respond." Rodriguez's "eyes were bloodshot and watery," and his speech was "slurred," to the point that Sergeant McKinty did not know whether Rodriguez was speaking Spanish or English. The sergeant could also smell "a strong odor of alcohol coming out of the [Aztek]." Three Budweiser beer cans, at least one of which was full and one of which was empty, were later discovered inside the vehicle's cabin.

Sergeant McKinty repeatedly instructed Rodriguez in English to exit the vehicle, but Rodriguez just leaned toward the front passenger's seat. Eventually, a sheriff's deputy helped Sergeant McKinty pull Rodriguez out of the Aztek.

Soon afterward, Officer Lucas arrived to interrogate Rodriguez. Officer Lucas likewise observed that Rodriguez's eyes were "red and watery," and Rodriguez's breath smelled like alcohol. After the interrogation, which we

4

discuss in more detail below, Officer Lucas conducted three field sobriety tests. Rodriguez showed signs of alcohol impairment during all three tests.

A computer check revealed that Rodriguez was on DUI probation and his driver's license was suspended. Officer Lucas then administered two preliminary alcohol screening (PAS) tests to Rodriguez. The first test, which was performed at 11:21 p.m., showed that Rodriguez's blood-alcohol content (BAC) was .24 percent. The second test, which was performed four minutes later, showed his BAC was .25 percent.

Officer Lucas arrested Rodriguez for DUI and gave him the option of submitting to a blood test or an official breath test. Rodriguez elected a blood test, requiring his transport to a hospital. The blood sample, which was drawn at 1:30 a.m. the following morning, showed his BAC was .251 percent.[4]

C.      *Rodriguez's Statements to Law Enforcement*

Rodriguez was questioned by CHP officers three times, and all three interrogations were recorded and played for the jury. The first interrogation was recorded from a distance by a patrol vehicle's mobile video audio recording system (MVARS), and the recordings of the other two interrogations were audio only.

1.      First interrogation

After Rodriguez was removed from the patrol vehicle where he was waiting, Officer Lucas interviewed him. Officer Daniel Dinsing, who spoke Spanish but was not certified to translate it by the CHP, served as translator.

Rodriguez said he was at a friend's house earlier that night and was driving by himself to his sister's house when he dropped his cell phone on the

---

[4] A criminalist testified that the PAS tests, which indicated that Rodriguez had approximately the same BAC as the blood test showed he had two hours later, could have underestimated Rodriguez's true level of intoxication.

5

Aztek's floor. As he was trying to retrieve the phone, he hit a pole. He continued to his sister's house because he saw no reason to stay at the scene, and he decided to sleep in the car so he would not disturb his sister. Rodriguez indicated that he did not have any physical problems or impairments and did not hit his head during the crash.

Rodriguez denied several times that he hit a person, both before and after the CHP officers informed him a pedestrian was killed. When told there was blood on the outside of the Aztec, Rodriguez claimed it was his. He said it got there when he got out to inspect the damage, wiped blood from his nose, and touched the vehicle.

Rodriguez admitted that beginning around 2:30 p.m., he drank six to seven Bud Light beers. He agreed that six to seven hours had passed since his last drink. Although he acknowledged that he knew he could kill someone if he drove while drunk, he consistently denied that he was drunk during the crash, and he denied drinking alcohol after it.

### 2. Second interrogation

Approximately 30 minutes later, upon arriving at the hospital for the blood draw, Rodriguez was interviewed by Officer Lucas and another officer, who was certified as a Spanish translator by the CHP. Rodriguez repeated much of what he said before, including that he was alone in the Aztek, that he crashed into the pole because he was looking for his dropped cell phone, that he did not hit a person and any blood on the car was his, that he was not drunk during the crash, and that he was not "injured or sick." He also again confirmed that he knew that "when you're driving under the influence of alcohol, you can kill someone," stating that it "would be a disgrace" to do so.

6

### 3.  Third interrogation

Two days after the crash, Officer David Cabrera, who was certified by the CHP as a Spanish translator, questioned Rodriguez in Spanish at the jail. Rodriguez reported that his cell phone rang, he dropped it, and when he bent down to get it, he "hit a post."  He stated, "[A]fter I hit the post I became nervous and I started bleeding. . . .  I said, 'I'm gonna look for help.'  After that, I ran to my sister's house to call an ambulance, but then I found an officer and there I was assisted by them[, t]hank God."  Although the fluid trail showed that Rodriguez followed an indirect route, requiring six turns, to get to his sister's house, he told Officer Cabrera that he took a different route that would have required only two turns.

Consistent with his prior statements, Rodriguez denied that he hit a pedestrian.  Attempting to explain the blood on the outside of the Aztek, he stated, "When I reached my sister's house I washed my face and went to see the impact that I gave it (unintelligible).  So I stayed there sitting down and . . . I leaned back like this on . . . the car and placed my hand like this and left a big blood stain, but it was mine because I didn't hit any other person."

Rodriguez again confirmed that he knew if he drank and drove he could kill someone.  He also confirmed that he drank six beers before the crash and did not consume any alcohol after it.  This time, however, he stated that he began drinking at around 5:00 p.m., not 2:30 p.m., and that he had the last drink when "it was already getting dark."

### D.  Procedural History

Rodriguez was charged with second degree murder, gross vehicular manslaughter while intoxicated, and hit-and-run causing death, all felonies,

7

and a misdemeanor count of driving with a suspended license.[5]  The count of gross vehicular manslaughter was accompanied by allegations that Rodriguez had three prior DUI convictions and fled the scene of the crime.[6]  The jury found him guilty of all counts and enhancements as charged.

On May 21, 2019, the trial court sentenced Rodriguez to a total term of 20 years to life in prison, composed of a term of 15 years to life for gross vehicular manslaughter while intoxicated and a consecutive term of five years for the fleeing-the-scene enhancement.  A concurrent term of 180 days in county jail was imposed for driving with a suspended license, and a term of 15 years to life for murder and the upper term of four years for hit-and-run causing death were imposed and stayed.

Rodriguez immediately appealed.  Due to numerous extensions of time sought by both parties, the matter did not become fully briefed until October 2021.  On August 9, 2022, the appeal was transferred from the Fifth District Court of Appeal to this court for decision.

II.
DISCUSSION

Rodriguez claims that his statements during the three interrogations were admitted in violation of his *Miranda* rights.  We agree.

---

[5] The charges were brought under Penal Code sections 187 (murder) and 191.5, subdivision (a) (gross vehicular manslaughter), and Vehicle Code sections 20001, subdivision (b)(2) (hit-and-run), and 14601.2, subdivision (a) (driving with suspended license).  All further statutory references are to the Vehicle Code unless otherwise noted.

[6] The allegation of prior DUI convictions was made under Penal Code section 191.5, subdivision (d), based on 2008, 2015, and 2017 convictions for violating section 23152, subdivision (a).  The fleeing-the-scene allegation was made under section 20001, subdivision (c).

8

*A. Additional Facts*

At the outset of the first interrogation, Officer Lucas read Rodriguez his

*Miranda* rights, with Officer Dinsing translating, as follows:[7]

| | |
|---|---|
| OFFICER LUCAS: | Listen[,] you have the right to remain silent.  Do you understand? |
| OFFICER DINSING: | Okay.  You have the right to remain silent.  Do you understand? |
| [RODRIGUEZ]: | (Unintelligible.) |
| OFFICER LUCAS: | Anything you say may be used against you in court.  Do you understand? |
| OFFICER DINSING: | Anything you say may be used against you in court.  Do you understand?  Say yes or no (unintelligible). |
| [RODRIGUEZ]: | Yes. |
| OFFICER LUCAS: | You have the right to the presence of an attorney before and during any questioning.  Do you understand? |
| OFFICER DINSING: | You have the right to call an attorney before, during interrogation.  Do you understand? |
| [RODRIGUEZ]: | Yes. |
| OFFICER LUCAS: | If you cannot afford an attorney one will be appointed for you free of charge before any questioning if you want.  Do you |

---

[7] The exchange is quoted from the transcript of the videotaped interview.  Instead of reproducing Rodriguez's and Officer Dinsing's statements in Spanish, the transcript contains translations of those statements back into English.  The parties do not dispute that the translations are accurate.

9

|  |  |
|---|---|
|  | understand? |
| OFFICER DINSING: | If you cannot pay an attorney one will be called for you free of charge before the interrogation if you said. Do you understand? |
| [RODRIGUEZ]: | (Unintelligible.) |
| OFFICER DINSING: | Yes? Say yes man – man. (Unintelligible.) |

Rodriguez was not read his *Miranda* rights at the second interrogation, which occurred only a short time later. At the outset of the third interrogation, Officer Cabrera read Rodriguez his rights again as follows:[8]

|  |  |
|---|---|
| OFFICER CABRERA: | [B]efore I talk to you, I want to let you know that you have been arrested. You already know that you have been arrested. Your rights, you have the right to remain silent, a- any declaration that you give may be used against you. You have the right to speak to an attorney, to have an attorney present while we ask you questions. |
| [RODRIGUEZ]: | Very well. |
| OFFICER CABRERA: | Do you understand your rights? |
| [RODRIGUEZ]: | Yes. I understand them. |
| OFFICER CABRERA: | Okay, sir. After understanding your rights, do you want to talk to me? |
| [RODRIGUEZ]: | Of course. Why not? (Unintelligible.) |

---

[8] We quote from the transcript of the audio interview, which contains English translations of Rodriguez's and Officer Cabrera's original Spanish statements. Again, the parties do not dispute the translations' accuracy.

Before trial, Rodriguez moved to exclude his interrogation statements under *Miranda*. In regard to the first interrogation, Rodriguez's trial counsel argued that Officer Dinsing did not "fully translate *Miranda* properly," explaining, "There's a big difference between you can *call* an attorney," which Officer Dinsing said in Spanish, "and you have the right to the presence of an attorney," which Officer Lucas originally said. (Italics added.) Also, while Officer Lucas said that if Rodriguez could not afford an attorney, "one [would] be appointed for [him] free of charge," Officer Dinsing translated the latter part of that statement as "one [would] be *called* for [him] free of charge." (Italics added.) The prosecutor responded that defense counsel was "nitpick[ing] Spanish words and what they mean as being defective for *Miranda*."

In regard to the third interrogation, Rodriguez's counsel contended, and the prosecutor agreed, that Officer Cabrera "did not give the full *Miranda* advisement" because the officer did not ask whether Rodriguez understood that he was entitled to have an attorney appointed for him if he could not afford one. Defense counsel argued that because two days had passed since Rodriguez was originally read his *Miranda* rights, he should have been readvised "in full." The prosecutor responded that even if "best practices" were not used, Rodriguez was read his full *Miranda* rights at the first interrogation, and he clearly waived his right against self-incrimination on that occasion.

The trial court ruled that "the necessary *Miranda* advisals were given" during the first interrogation. Although Officer Dinsing's translation contained "some differences in words," those differences did not "dissipate, minimize, nor incorrectly advise [Rodriguez] of these necessary rights." The court also found that Rodriguez "impliedly waived those rights knowingly,

11

voluntarily, and intelligently before participating in [the] interview." Finally, the court confirmed that because the second interrogation occurred only 30 minutes later, "a second advisal was unnecessary." Thus, Rodriguez's statements during the first two interrogations were admissible.

The trial court ruled that another *Miranda* advisement was required before the third interrogation because it was custodial and two days had passed since the first interrogation. The court also agreed with the parties that Officer Cabrera's "advisement was inadequate." Although the court "would, without hesitation, exclude [Rodriguez's] statements" during the third interrogation if that were the first time he was advised under *Miranda,* the court determined it would be "remiss if it were not to consider that the initial *Miranda* advisement given . . . was an adequate advisement as previously found."

Thus, the trial court addressed the issue of "what effect, if any, . . . an inadequate advisement [has] when it follows an adequate advisement." Relying on *People v. Duren* (1973) 9 Cal.3d 218 (*Duren*), the court concluded that "based on the proper advisal two days earlier and, just as importantly, [Rodriguez's] waiving his rights knowingly, intelligently, and voluntarily [at that time], . . . [Rodriguez] nonetheless did participate voluntarily in an interview with Officer Cabrera still under the guise of the *Miranda* advisal previously given." Therefore, the court ruled that Rodriguez's statements during the third interrogation were also admissible.

B. *The Admission of Rodriguez's Statements Violated* Miranda.

"The Fifth Amendment to the United States Constitution, which applies to the states by virtue of the Fourteenth Amendment, provides that no person may be compelled to be a witness against himself or herself." (*People v. Linton* (2013) 56 Cal.4th 1146, 1170–1171.) *Miranda* held that a

suspect must be warned prior to any custodial interrogation "that [the suspect] has the right to remain silent, that anything [the suspect] says can be used against [the suspect] in a court of law, that [the suspect] has the right to the presence of any attorney, and that if [the suspect] cannot afford an attorney one will be appointed . . . prior to any questioning if [the suspect] so desires." (*Miranda, supra*, 384 U.S. at p. 479; *Linton*, at p. 1171.) "[A] defendant's statement is inadmissible unless all four warnings were given to the defendant prior to the interrogation, regardless of the defendant's understanding of [those] rights." (*People v. Bradford* (2008) 169 Cal.App.4th 843, 852.)

We review de novo "a trial court's granting or denial of a motion to suppress a statement under *Miranda* insofar as the trial court's underlying decision entails a measurement of the facts against the law." (*People v. Waidla* (2000) 22 Cal.4th 690, 730.) To the extent the ruling relies on factual findings, we review those findings for substantial evidence, but we "examine[] independently the resolution of a pure question of law . . . [and] the resolution of a mixed question of law and fact that is predominantly legal." (*Ibid.*)

### 1. The first interrogation

Rodriguez claims the first *Miranda* advisement "did not convey the right to an attorney to be appointed free of charge." He argues that because he was informed in Spanish that he had "the right to call an attorney before, during interrogation" and that if he could not "pay an attorney one [would] be called for [him] free of charge before the interrogation," the latter warning "suggest[ed] that the call would not cost [him], without addressing whether

13

the lawyer would be provided at no charge." We agree that Rodriguez was inadequately advised of this right at the first interrogation.[9]

Although "[t]he four warnings *Miranda* requires are invariable," the United States Supreme Court "has not dictated the words in which the essential information must be conveyed. [Citations.] In determining whether police officers adequately conveyed the four warnings, . . . reviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] . . . [the suspect's] rights as required by *Miranda*." ' " (*Florida v. Powell* (2010) 559 U.S. 50, 60; *People v. Wash* (1993) 6 Cal.4th 215, 236–237.) In other words, "no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures" so long as " 'a fully effective equivalent' " is given. (*California v. Prysock* (1981) 453 U.S. 355, 359–360, italics added (*Prysock*).)

The purpose of the advisement at issue is to inform indigent people, who are those "most often subjected to interrogation," that they "too ha[ve] a right to have counsel present." (*Miranda, supra*, 384 U.S. at p. 473.) "Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that [a suspect] can consult with a lawyer if [the suspect] has one or has the funds to obtain one." (*Ibid.*) To be effective, this advisement must make clear that a suspect has a "right to the presence of appointed counsel prior to and during interrogation," not merely at "a future point in time after . . . interrogation." (*Prysock, supra*, 453 U.S. at p. 360.) In assessing whether the advisement of this right was

---

[9] As a result, we need not address Rodriguez's alternative argument that he did not knowingly and intelligently waive his right to remain silent at the first interrogation.

14

effective, courts may consider whether the immediately preceding advisement about the right to counsel in general was "clearly conveyed" and, if so, whether the advisement at issue "suggested any limitation on the right to the presence of appointed counsel different from" the general right. (*Id.* at pp. 360–361.)

Applying these principles here, we conclude that Officer Dinsing's translation did not adequately convey that Rodriguez was entitled to appointed counsel before and during the interrogation. Officer Dinsing informed Rodriguez that if he could not afford an attorney, one would be "called for [him] free of charge before the interrogation." This statement is ambiguous, because it could mean that an attorney would be summoned for Rodriguez free of charge, but it could also mean that an attorney would be contacted by telephone for him free of charge. Particularly given the popular understanding of an arrestee's right to make telephone calls, including to an attorney (see Pen. Code, § 851.5), a reasonable person could arrive at the latter interpretation.

The Attorney General implicitly concedes that if the statement is interpreted to mean that a telephone call to an attorney would be free, then it did not adequately inform Rodriguez that he was entitled to the presence of appointed counsel. The Attorney General claims "[t]his interpretation makes little sense," however, because Rodriguez was informed that his "right to have an attorney 'called for [him] free of charge' only arises '[i]f [he] cannot pay an attorney.' " The Attorney General contends that since "it would be illogical to provide a suspect a free telephone call to an attorney [the suspect] could not afford," it is more reasonable to interpret "the 'free of charge' language [as] referr[ing] to the cost of an attorney" generally, not the cost of a telephone call.

15

We might find this argument more convincing were it not for the immediately preceding advisement, which compounded the ambiguity. Officer Dinsing's translation of that warning informed Rodriguez that he had "the right to *call* an attorney"—not "the right to the presence of an attorney" as Officer Lucas stated—before and during the interrogation. (Italics added.) Not only did this translation also contain the ambiguous word "call," it did not clearly express that the attorney had to be physically present during the interrogation if Rodriguez wished. (See *Miranda, supra*, 384 U.S. at p. 469.) Thus, even if the warning at issue otherwise reasonably conveyed that Rodriguez was entitled to appointed counsel without charge, it was still deficient because his general right to counsel was not adequately communicated. (Cf. *Prysock, supra*, 453 U.S. at pp. 360–361.)

In short, the *Miranda* advisement before the first interrogation was inadequate to inform Rodriguez of his right to appointed counsel. As a result, his statements during that interrogation were inadmissible. In turn, because Rodriguez was not readvised of his *Miranda* rights before the second interrogation, his statements during that interrogation were necessarily inadmissible as well.

2. The third interrogation

Rodriguez also claims the trial court erred by concluding that Officer Cabrera's failure to advise him of the right to appointed counsel before the third interrogation was cured because he was properly advised of that right before the first interrogation. We again agree.

"Where a subsequent interrogation is ' "reasonably contemporaneous" ' with the prior waiver, and the prior waiver was 'knowing and intelligent,' police need not undertake a *Miranda* readvisement." (*People v. Spencer* (2018) 5 Cal.5th 642, 668.) In *People v. Mickle* (1991) 54 Cal.3d 140 (*Mickle*),

16

our state Supreme Court explained that when determining whether readvisement is necessary, "courts examine the totality of the circumstances, including the amount of time that has passed since the [initial] waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that [the suspect] subjectively understands and waives [the suspect's] rights." (*Id.* at p. 170.)

To begin with, as discussed above, the advisement before the first interrogation was inadequate because it did not clearly convey Rodriguez's right to appointed counsel. For this reason alone, the omission of an advisement about that right before the third interrogation rendered Rodriguez's subsequent statements inadmissible.

Even if the first advisement had been adequate, we would agree with Rodriguez that his statements during the third interrogation were inadmissible. After explicitly concluding that a *Miranda* readvisement was required at the third interrogation and that the readvisement Rodriguez received was inadequate, the trial court nonetheless concluded that under *Duren* he "did participate voluntarily [at the third] interview still under the guise of the *Miranda* advisal previously given." But *Duren* does not support the proposition that a later, inadequate advisement can be cured by an earlier, adequate advisement even if the later interrogation was "an entirely separate session" requiring readvisement. (*People v. Spencer, supra,* 5 Cal.5th at p. 670.) Rather, although not couched in such terms, *Duren* implicitly concluded that the two interrogations at issue there were reasonably contemporaneous, noting that they occurred the same day and that the officers who insufficiently advised the defendant confirmed with him that another officer had previously given him the proper advisement. (*Duren,*

*supra*, 9 Cal.3d at p. 242.) If it were the case that a defendant's legitimate waiver of *Miranda* rights during one interrogation established the defendant effectively waived those rights for any future interrogation without regard to the contemporaneousness requirement, readvisement would never be needed.

Apparently recognizing that the admissibility of Rodriguez's statements during the third interrogation turns on the contemporaneousness requirement, the Attorney General does not defend the trial court's reasoning but instead argues that readvisement was unnecessary in light of the *Mickle* factors. We disagree. It appears that approximately 36 hours passed between the first and third interrogations.[10] This is a substantial time period, even if decisions cited by the Attorney General establish it is not too long as a matter of law. (See *People v. Pearson* (2012) 53 Cal.4th 306, 317 [interrogations were reasonably contemporaneous where there was a 27-hour gap between them]; *People v. Williams* (2010) 49 Cal.4th 405, 434–435 [same for 40-hour gap]; *Mickle, supra*, 54 Cal.3d at p. 171 [same for 36-hour gap].) Moreover, the third interrogation was conducted by a different interrogator in a different location, and there was no "official reminder of the prior advisement."[11] (*Mickle*, at p. 170.) These factors weigh against a finding of contemporaneousness and distinguish this case from the cited decisions. (See *Pearson*, at pp. 316–317 [two jailhouse interrogations by same officer who

---

[10] Documentation in the record suggests the third interrogation was at 12:15 p.m. on June 5, 2017.

[11] The Attorney General claims that Officer Cabrera "did remind [Rodriguez] of his *Miranda* rights by re-advising [Rodriguez] of [those] rights, while inadvertently leaving out that counsel would be provided free of charge." But there must be a reminder that the first, proper advisement occurred, not merely an incomplete reiteration of the rights themselves, to support the conclusion that readvisement was unnecessary. (See *Mickle, supra*, 54 Cal.3d at p. 170.)

18

confirmed at second interrogation that defendant "remembered his *Miranda* rights"]; *Williams*, at p. 435 [interrogations conducted at same location and same investigator participated in them]; *Mickle*, at p. 171 [interrogations in different locations but conducted by same two officers, who reminded defendant of earlier interaction].)

The record also contains affirmative evidence that Rodriguez did not "subjectively understand[]" his right to appointed counsel. (*Mickle, supra*, 54 Cal.3d at p. 170; cf. *People v. Pearson, supra*, 53 Cal.4th at p. 317 [observing nothing in record "suggesting . . . that [the] defendant had forgotten or no longer understood his rights"].) At the end of the third interrogation, Rodriguez said, "I don't know if the county is going to provide someone or if I have to get a private one or . . . ." Officer Cabrera responded, "However you'd like." Rodriguez stated, "It's that I don't have money," and the officer replied, "If you don't have money, they can appoint you an attorney." The Attorney General attempts to minimize Rodriguez's first statement as a "more procedural" question about "the mechanics of how and when he would get counsel." But the statement can also be interpreted to mean Rodriguez was wondering whether he would be appointed counsel for free or would "have to" retain private counsel at his own expense. Under this interpretation, his statements suggest he did not understand his right to appointed counsel while Officer Cabrera was questioning him.

Finally, the Attorney General notes that Rodriguez "had a long criminal history" and was presumably "quite familiar with the criminal justice system." Although a suspect's previous experience with that system may be relevant (*Mickle, supra*, 54 Cal.3d at p. 170), it does not offset the numerous other factors in this case weighing against contemporaneousness. Moreover, Rodriguez's limited command of English and his apparent

19

misunderstanding of his right to appointed counsel cast doubt on whether he actually understood his *Miranda* rights from his past interactions with law enforcement.

In sum, readvisement was required before the third interrogation, not only because the first advisement was itself inadequate but also because the third interrogation was not reasonably contemporaneous with the first interrogation. Thus, the statements Rodriguez made during the third interrogation were inadmissible as well.

C. *The Error in Admitting Rodriguez's Statements Was Prejudicial.*

Having concluded that Rodriguez's statements during all three interrogations were admitted in violation of *Miranda*, we turn to whether the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Flores* (2020) 9 Cal.5th 371, 439–440; *In re Matthew W.* (2021) 66 Cal.App.5th 392, 410 (*Matthew W.*).) Although there was strong evidence supporting the convictions, we cannot conclude beyond a reasonable doubt that the admission of Rodriguez's statements was harmless.

To assess whether a *Miranda* error was prejudicial, we must "determine 'whether the error was harmless beyond a reasonable doubt—that is, whether it is clear beyond a reasonable doubt that use of the statement[s] did not contribute to the verdict. [Citation.] Under this test, the appropriate inquiry is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." ' " (*Matthew W., supra,* 66 Cal.App.5th at pp. 410–411, quoting *People v. Quartermain* (1997) 16 Cal.4th 600, 621.) "[T]he evidence that remains after [the challenged] statements are excluded must not only be sufficient to support the verdict, but must *overwhelmingly* establish [the defendant's]

20

guilt beyond a reasonable doubt." (*People v. Villasenor* (2015) 242 Cal.App.4th 42, 69, italics added.)

The People have the burden to demonstrate " 'beyond a reasonable doubt that the error did not contribute to the verdict.' " (*In re Loza* (2018) 27 Cal.App.5th 797, 805.) "The proper test for prejudice requires [us to] consider[] . . . not only the evidence that would support the judgment, but also the impact of the inadmissible evidence on the final outcome." (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884.) We pay special attention to the prosecution's closing arguments, as "[a] prosecutor's reference to evidence that should not have been presented to the jury increases the potential for prejudice flowing from the error." (*People v. Diaz* (2014) 227 Cal.App.4th 362, 384; *Loza*, at p. 805.)

Initially, we review the elements of the felonies of which Rodriguez was convicted.[12] The jury was instructed under CALCRIM No. 2140 that the offense of hit-and-run causing death required proof that (1) Rodriguez was involved in a vehicle accident while he was driving; (2) the accident caused someone else's death; (3) he "knew that he had been involved in an accident that injured another person or knew from the nature of the accident that it was probable that another person had been injured"; and (4) he willfully failed to perform a duty under sections 20003 or 20004, such as providing reasonable assistance to any injured person. (See § 20001, subd. (b)(2).)

---

[12] In closing, Rodriguez's trial counsel conceded that Rodriguez was guilty of the misdemeanor count of driving with a suspended license. Given this concession, as well as the Department of Motor Vehicles record admitted into evidence showing his license was suspended and the other evidence that he drove the Aztek, we conclude beyond a reasonable doubt that he would have been convicted of the misdemeanor even if the interrogations were excluded.

The jury was instructed under CALCRIM No. 590 that Rodriguez was guilty of gross vehicular manslaughter while intoxicated if he (1) drove while under the influence of alcohol; (2) committed an infraction while doing so; (3) committed the infraction with gross negligence; and (4) caused the death of another person through his grossly negligent conduct. (See Pen. Code, § 191.5, subd. (a).) Acting with gross negligence was defined as acting "so different[ly] from the way an ordinarily careful person would act in the same situation that [the] act amounts to disregard for human life or indifference to the consequences of that act."

Finally, the jury was instructed under CALCRIM No. 520 that Rodriguez was guilty of second degree murder if he committed an act causing a person's death with malice aforethought. (See Pen. Code, § 187, subd. (a).) The instruction further provided that he acted with express malice if he "unlawfully intended to kill" and that he acted with implied malice if (1) he intentionally committed an act; (2) the act's natural and probable consequences were dangerous to human life; (3) "[a]t the time he acted, he knew his act was dangerous to human life"; and (4) "[h]e deliberately acted with conscious disregard for human life."

The Attorney General argues that the error was harmless because "[t]he prosecution . . . could readily prove every element" of the charges "without using any of [Rodriguez's] statements." According to the Attorney General, "[a]t most, [Rodriguez's] statements provided some additional proof that [Rodriguez] was driving the vehicle that night, that he was intoxicated, and that he knew the dangers of drunk driving," but "these facts . . . were overwhelmingly established by other evidence."

We acknowledge there was compelling evidence supporting the charges. The physical evidence left no reasonable doubt that the Aztek hit the utility

22

pole and hit and killed Rico. In addition, even apart from Rodriguez's admissions during the interrogations, it was clear that Rodriguez was driving during the crash, since his blood was on the driver's-side airbag. In turn, the numerous tests showing his high BAC constituted overwhelming evidence that he was legally intoxicated when he caused the crash.

The evidence was less overwhelming, however, when it came to establishing Rodriguez's mens rea. His interrogation statements were damning in this regard. In them, Rodriguez acknowledged numerous times that he knew that drunk driving could cause another person's death, crucial evidence that he acted with both gross negligence and implied malice. (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1208 [defendant's knowledge of drunk driving's risks is proof of gross negligence]; *People v. Watson* (1981) 30 Cal.3d 290, 300–301 (*Watson*) [same for implied malice].)

The Attorney General points out that in connection with his prior DUI convictions Rodriguez "signed advisements pursuant to . . . *Watson*," which were introduced into evidence.[13] Thus, the Attorney General claims, Rodriguez's statements that he was aware of the dangers of drunk driving were "cumulative."

As the closing arguments show, however, Rodriguez's live, repeated admissions in the immediate aftermath of a fatal crash were key evidence

---

[13] Under section 23593, a trial court must give an advisement based on *Watson* to a defendant convicted of various DUI offenses, including the offense of which Rodriguez was previously convicted three times. (See *People v. Yushchuk* (2018) 28 Cal.App.5th 120, 123.) The required advisement informs a defendant that " 'it is extremely dangerous to human life to drive while under the influence of alcohol' " and that " '[i]f [the defendant] continue[s] to drive while under the influence of alcohol . . . and, as a result of that driving, someone is killed, [the defendant] can be charged with murder.' " (§ 23593, subd. (a).)

23

bolstering the prosecution's case. The prosecutor began his closing argument by stating that Rico died because Rodriguez "made very specific choices knowing very specific things." The prosecutor then described the "numerous times" throughout all three interrogations that Rodriguez said he knew he could kill someone if he drove drunk. The prosecutor also discussed the previous *Watson* advisements, but Rodriguez's trial counsel countered that there was reason to doubt that Rodriguez understood them, as it was unclear whether they were translated for him, it did not appear he had counsel present while he was advised of his rights, and people routinely sign documents they have not read.

In rebuttal, the prosecutor emphasized that Rodriguez wanted to blame everyone but himself for Rico's death, arguing, "What I picked up [from the defense's closing argument] was it's the [c]ourt's fault [when giving the *Watson* advisements]. It's the interpreter's fault. It's the counsel on the day of court's fault because he didn't know. How could he know? He doesn't speak English. [¶] Well, we know from the MVARS [of the first interrogation] that he does, in fact, know[,] because he tells the officers yes, I recall that being told to me in court." The prosecutor proceeded to highlight evidence that Rodriguez did understand English, including that he "[spoke] some English in the MVARS. The fact that he speaks Spanish, even if provided an interpreter, is not a defense."

Thus, a substantial portion of the closing arguments was devoted to the significance of the prior *Watson* advisements, and the prosecutor relied on Rodriguez's interrogations to prove his mens rea both directly, as he admitted during them that he understood the dangers of drunk driving, and indirectly, as they showed he understood English well enough to have understood the *Watson* advisements. Had the interrogation statements been excluded, the

24

remaining evidence of Rodriguez's knowledge of these dangers would have been weaker, and the defense's attack on that evidence would have been more likely to succeed.

Rodriguez's interrogations were also a rich source of information about his post-crash behavior, which also tended to prove he acted with the requisite mens rea for the homicide offenses. (See *People v. Thompson* (2010) 49 Cal.4th 79, 113 [post-crime statements and behavior may be relevant to prove defendant had intent to kill at time of murder]; *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1172 [defendant's "indifferen[ce] to the consequences of her actions" immediately after fatal collision was evidence defendant acted with gross negligence].) At no time after being told he hit a pedestrian did Rodriguez ever express concern for Rico or remorse for the other man's death. To the contrary, Rodriguez focused on his own trauma, claiming that he was the one who left blood on the front of the Aztek and that he left the scene because he needed medical help for himself. This evidence resonated with the prosecutor's theme in closing that Rodriguez "just didn't care" about anyone else.

Finally, the interrogation statements helped the prosecution prove the knowledge element of hit-and-run causing death, that Rodriguez knew or should have known he was in a crash that injured another person. His trial counsel argued in closing that this element was not established because the jury was required to credit Rodriguez's claim that he thought he hit only a pole, not a person. But the physical evidence and other portions of the interrogations undermined this defense and tended to prove Rodriguez did know he injured someone else.

First, if Rodriguez was to be believed that he crashed because he dropped his cell phone, not because he was inebriated, he should have noticed

that he hit a person.[14]  Indeed, the Aztek hit the pole, traveled a few blocks north, and *then* hit Rico, so even if Rodriguez hit the pole while he was distracted by the phone, there is no apparent reason that distraction should have continued after the collision he admittedly did notice.  Second, in attempting to explain the blood on the outside of the Aztek, Rodriguez admitted that he exited the vehicle to inspect the damage.  This admission was also detrimental, because as the prosecutor argued, the damage to the front of the vehicle "clearly [came] from a human being."  In our view, a defense involving the knowledge element would have been more likely to succeed had none of Rodriguez's statements been admitted, since any benefit he derived from the statements was outweighed by their lack of credibility as a whole.  (See *Matthew W.*, *supra*, 66 Cal.App.5th at pp. 410, 414 [*Miranda* violation prejudicial where unlikely that juvenile court "could have evaluated the totality of the evidence presented . . . without being influenced to some degree by the evidence of [the minor]'s inconsistencies, lies, and evasions during his prearrest statements to police"].)

In short, the interrogation statements helped to prove Rodriguez's mens rea, the primary contested issue, for all the felony charges.  Since "we are unable to confidently say that the evidence of guilt in this case was so overwhelming" that the resulting convictions "were ' "surely unattributable" ' to the admission of [the interrogation] statements," the *Miranda* error requires reversal.  (*Matthew W.*, *supra*, 66 Cal.App.5th at p. 415.)

---

[14] The Attorney General claims that Rodriguez actually benefited from the admission of his statements that he crashed while distracted by the cell phone, because this allowed him to present a defense for which there was no other evidence.  In fact, Rodriguez's trial counsel did not rely on such a defense in closing.

26

## III.
### DISPOSITION

The judgment is affirmed in part and reversed in part. The convictions for second degree murder, gross vehicular manslaughter while intoxicated, and hit-and-run causing death are reversed, and the sentence is vacated. The matter is remanded for a new trial on the reversed counts. In all other respects, the judgment is affirmed.

                                   _____

                                      Humes, P.J.

WE CONCUR:


_____
Margulies, J.


_____
Devine, J. *

       *Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Rodriguez Moreno*  A165845